**MM COMPANIES, INC., Plaintiff Below, Appellant,**

v.

**LIQUID AUDIO, INC., Raymond A. Doig, Gerald W. Kearby, Robert G. Flynn, Stephen V. Imbler, Ann Winblad, James D. Somes and Judith N. Frank Defendants Below, Appellees.**

**No. 606, 2002.**

Supreme Court of Delaware.

Submitted: Dec. 3, 2002.
Decided: Jan. 7, 2003.

**20.** *Id.* at 17–18

**21.** 358 A.2d 725, 727–28 (Del.1976).

**22.** *Id.* at 728.

Grover C. Brown (argued) and Michael J. Maimone of Gordon, Fournaris & Mammarella, P.A., Wilmington, for appellant.

Stephen C. Norman, Kevin R. Shannon, John M. Seaman of Potter, Anderson & Corroon, L.L.P., Wilmington, Scott A. Edelman (argued), Courtney Scott and Sander Bak, Milbank, Tweed, Hadley & McCloy, New York City, for appellees.

Before HOLLAND, BERGER and STEELE, Justices.

HOLLAND, Justice:

This is an expedited appeal from a final judgment entered by the Court of Chancery. That final judgment permitted an incumbent board of directors to adopt defense measures which changed the size and composition of the board's membership. The record reflects that those defensive actions were taken for the primary purpose of impeding the shareholders' right to vote effectively in an impending election for successor directors. We have concluded that the judgment of the Court

of Chancery must be reversed. This matter is remanded for further proceedings in accordance with this opinion.

### Procedural Background

On August 26, 2002, MM Companies, Inc. ("MM") filed its original complaint in this action in the Court of Chancery against Liquid Audio, Inc. ("Liquid Audio"), as well as Raymond A. Doig, Gerald W. Kearby, Robert G. Flynn, Stephen V. Imbler and Ann Winblad (the "Director Defendants"). The original complaint sought injunctive relief against the August 22, 2002 action taken by the board of directors of Liquid Audio ("Board") to expand from five to seven members, and the purported effects that expansion might have on Liquid Audio's 2002 annual meeting that was scheduled for September 26, 2002. MM alleged that the Director Defendants' decision to expand the Board violated the principles established by the decision of the Court of Chancery in *Blasius* [1] and the decision of this Court in *Unocal*. [2] At a scheduling conference on August 29, 2002, the Court of Chancery set October 21, 2002 as the date for trial.

On September 26, 2002, Liquid Audio held its 2002 annual meeting at which MM's two nominees were elected as Class III directors replacing incumbent directors Doig and Kearby. On October 1, 2002, MM filed an amended complaint, once again seeking to invalidate the August 22, 2002 action by Liquid Audio's board of directors to expand the size of the Board from five to seven members and to appoint two new directors to those recently created vacancies. The amended complaint also alleges that the Director Defendants' decision to expand the Board violated the principles established by *Blasius* and *Unocal*.

### Chancery Court Denies Relief

Following discovery and each parties' submission of a pretrial brief, a trial was held on October 21, 2002. At the conclusion of the trial, the Court of Chancery ruled in favor of the defendants, holding that the Board expansion did not violate Delaware law under either *Blasius* or *Unocal*. The Court of Chancery rejected the plaintiff's independent *Blasius* claim on the basis that the addition of two new directors "did not impact the shareholder vote or the shareholder choices in any significant way." The Court of Chancery rejected the plaintiff's *Unocal* claim, on the basis that: plaintiff did "not contend that the board expansion was coercive," the expansion was not "preclusive," because the "choices that the shareholders had before the board action was taken were the same as they had after," and the plaintiff failed to make a showing that "the action that the board took falls outside a range of reasonable responses."

Following the entry of the final judgment, MM filed a Notice of Appeal and a Motion for Expedited Scheduling. The motion was granted by this Court. Oral argument was held on December 3, 2002.

### Issues on Appeal

MM has raised two issues on appeal. First, it contends that the Court of Chancery erred in ruling that the "compelling justification" standard, as enunciated in *Blasius*, was not applicable to the Board's action. In support of that argument, MM relies upon the finding by the Court of Chancery that the Director Defendants manipulated the size and composition of the Liquid Audio board during a contested election for directors *primarily* to inter-

1. *Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651 (Del.Ch.1988).

2. *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946 (Del.1985).

fere with and impede the success of MM's ability to gain two-of-five directorships on the Board, and, thus, to diminish the influence of MM's nominees on the Board.

Second, MM argues that the Court of Chancery erred in ruling that the precepts of this Court's holding in *Unocal* and its progeny were not violated by the Board's defensive action. According to MM, the Director Defendants never identified a legally cognizable threat to the corporate policy and effectiveness of Liquid Audio and, to the extent that a threat existed, never demonstrated that the "manipulation of the size and composition" of the Liquid Audio board was a reasonable response in relation to such threat. Based upon that asserted lack of record evidence, MM submits the Court of Chancery erred in concluding that this Court's holding in *Unocal* was not violated.

### Background Facts

Liquid Audio is a publicly traded Delaware corporation, with its principal place of business in Redwood City, California. Liquid Audio's primary business consists of providing software and services for the digital transmission of music over the Internet. MM is a publicly traded Delaware corporation with its principal place of business in New York, New York. As of October 2002, MM was part of a group that collectively held slightly over 7% of Liquid Audio's common stock.

For more than a year, MM has sought to obtain control of Liquid Audio. On October 26, 2001, MM sent a letter to the Liquid Audio board of directors indicating its willingness to acquire the company at approximately $3 per share. Liquid Audio's board rejected MM's offer as inadequate, after an analysis of the offer and consultation with its investment banker, Broadview International LLC ("Broadview").

Liquid Audio's bylaws provide for a staggered board of directors that is divided into three classes. Only one class of directors is up for election in any given year. The effect is to prevent an insurgent from obtaining control of the company in under two years.[3]

From November 2001, until August 2002, the Liquid Audio board of directors consisted of five members divided into three classes. Class I had two members (defendants Flynn and Imbler), whose terms expire in 2003; Class II had one member (defendant Winblad), whose term expires in 2004; and Class III had two members (defendants Kearby and Doig), whose terms expired in 2002. Defendants Flynn, Doig and Imbler were not elected to the Board by the stockholders of Liquid Auido. They were appointed to the Board by the directors of Liquid Audio to fill vacancies on the Board.

In October 2001, prior to the appointment of defendants Doig and Imbler to the Board, MM requested the Liquid Audio board to call a special meeting of the company's stockholders to consider filling the existing vacancies on the Board and to consider other proposals to be presented to the stockholders. On October 24, 2001, the Liquid Audio board issued a press release which stated that it had denied MM's request to call a special meeting because the Board believed that under the Liquid Audio bylaws stockholders are not permitted to call special meetings. Thereafter, the Board appointed defendants Doig and Imbler to the Liquid Audio board of directors.

---

**3.** *See* Lucian Arye Bebchuk, John C. Coates, IV & Guhan Subramanian, *The Powerful Anti-takeover Force of Staggered Boards: Theory,* *Evidence, and Policy,* 54 Stanford L.Rev. 887 (2002).

### MM's Various Actions

On November 13, 2001, MM announced its intention to nominate its own candidates for the two seats on Liquid Audio's board of directors that were up for election at the next annual meeting. On December 18, 2001, MM delivered a formal notice to Liquid Audio stating that it intended to nominate Seymour Holtzman and James Mitarotonda as directors to fill the two seats on the Board then held by the individuals designated as Class III directors whose terms expired at the next annual meeting. The December 18, 2001 notice also requested that the Board adopt resolutions declaring certain amendments to the certificate of incorporation and bylaws advisable and that such amendments be submitted to the stockholders.

On December 20, 2001, MM sent notice to Liquid Audio informing the Board of its intention to bring before the annual meeting a proposal that would amend the bylaws and increase the size of the Board by four members. The December 20, 2001 notice also informed the Board of MM's intention to nominate four individuals as directors to fill those four newly created directorships. MM subsequently demanded that the Board commit to fixing an annual meeting date by February 22, 2002.

On February 22, 2002, MM renewed its October 2001 offer to acquire Liquid Audio. That offer, however, was at the reduced price of $2.50 per share. The Liquid Audio board rejected that offer as inadequate.

On May 17, 2002, MM forwarded a written demand to Liquid Audio under Section 220,[4] which requested a list of stockholders of Liquid Audio and related materials. Liquid Audio did not respond to the demand letter. On May 30, 2002, MM filed an action under Section 220 seeking, among other things, an order of the Court of Chancery directing that Liquid Audio forward to MM the information identified in the demand letter. A hearing before the Court of Chancery with respect to the Section 220 complaint was scheduled to be held on June 14, 2002.

On June 10, 2002, MM filed proxy materials with the Securities and Exchange Commission ("SEC") and commenced soliciting proxies for a shareholder meeting Liquid Audio planned to have on July 1, 2002. In addition to proposing two nominees for the Board, MM's proxy statement included a takeover proposal to increase the size of the Board by an additional four directors and to fill those positions with its nominees. As outlined in its initial proxy materials, MM's takeover proposal sought to expand the Board from five members to nine. If MM's two directors were elected and its four proposed directors were also placed on the Board, MM would control a majority of the Board.

### Alliance Merger

On June 13, 2002, Liquid Audio announced a stock-for-stock merger transaction with Alliance Entertainment Corp. ("Alliance"). This announcement came three days after MM mailed its proxy statement and other materials to the stockholders of Liquid Audio, and one day before the scheduled Court of Chancery hearing in connection with the Section 220 complaint. In addition to announcing the merger, the Liquid Audio board also announced that: the July 1, 2002 meeting would be postponed; a special meeting of stockholders of Liquid Audio would be held sometime in the future to vote upon the merger; and, if the merger received the requisite stockholder and regulatory approval, the merger would "close in the

4. Del.Code Ann. tit. 8, § 220 (1999).

Fall of 2002." Based upon this announcement, the annual meeting was postponed indefinitely by the Liquid Audio board.

The merger with Alliance that was announced to the stockholders of Liquid Audio on June 13, 2002 and the merger agreement executed by Liquid Audio and Alliance in connection therewith were not approved unanimously by the Board. The record reflects that at a meeting of the Board held to vote upon the merger and the merger agreement, defendants Kearby, Flynn, Imbler and Doig voted for the merger and the merger agreement and defendant Winblad voted against the merger and the merger agreement.

After Liquid Audio announced that the annual meeting would be postponed indefinitely, MM filed an amended complaint, seeking an order of the Court of Chancery directing Liquid Audio to hold the annual meeting as soon as possible, and a motion for expedited and summary proceedings. On June 20, 2002, the Court of Chancery granted MM's motion for expedited and summary proceedings and directed that a trial in connection with MM's application for relief be held on July 15, 2002.

Shortly, before that trial took place, the Liquid Audio board announced that certain terms of the merger agreement had been modified to permit Liquid Audio to conduct a self-tender offer under which Liquid would acquire up to 10 million shares of its common stock at $3.00 per share in cash, if the merger was approved by the stockholders of Liquid Audio. Upon consummation of the merger and a fully subscribed self-tender offer, Liquid Audio's stockholders would own 26% and Alliance stockholders would own 74% of the combined enterprise. The Liquid Audio board also announced that certain senior officers of Liquid Audio committed not to tender their shares in the self-tender offer. Finally, the Liquid Audio board announced that the Director Defendants reduced the "trigger" of Liquid Audio's shareholders rights plan or "poison pill" to 10% from 15%. The modified merger agreement was approved unanimously by the Board at a meeting held on July 14, 2002.

After expedited discovery, a trial was held on July 15, 2002. The Court of Chancery ordered that the annual meeting of Liquid Audio's shareholders occur on September 26, 2002. The record date for the meeting was August 12, 2002.

### Board Adds Two Directors

By the middle of August 2002, it was apparent that MM's nominees, Holtzman and Mitarotonda, would be elected at the annual meeting, to serve in place of the two incumbent nominees, as members of the Liquid Audio board. On August 23, 2002, Liquid Audio announced that the Board had amended the bylaws to increase the size of the Board to seven members from five members. The Board also announced that defendants James D. Somes and Judith N. Frank had been appointed to fill the newly created directorships. Defendant Somes was appointed to serve as a Class II member of the Board and defendant Frank was appointed to serve as a Class I member of the Board. After the Board expanded from five directors to seven, MM revised its proxy statement to note that its proposal to add four directors, if successful, would have resulted in a board with eleven directors, instead of nine.

### MM Challenges Board Expansion

On August 26, 2002, MM filed its initial lawsuit challenging the Board's decision to add two directors. In the initial complaint, MM alleged that the Board expansion interfered with MM's ability to solicit proxies in favor of its two nominees for election to the Liquid Audio board at the annual

meeting. In support of this claim, MM alleged that "some stockholders would believe that electing two members of a seven-member board, rather than two members of a five-member board, would not be worthwhile, and, thus, such stockholders simply would not vote."

At the September 26, 2002 annual meeting, the two directors proposed by MM, Holtzman and Mitarotonda, were elected to serve as directors of the Board. Liquid Audio's stockholders, however, did not approve MM's takeover proposals that would have expanded the Board and placed MM's four nominees on the Board. The stockholders' vote on both issues was consistent with the recommendation of Institutional Investor Services ("ISS"), a proxy voting advisory service, which had recommended that the stockholders vote in favor of MM's two nominees, but recommended against stockholders voting to give MM outright and immediate control of the Board.

Following the election of MM's two nominees to the Liquid Audio board of directors at the annual meeting, MM filed an amended lawsuit, challenging the Board's appointment of directors Somes and Frank. In the amended complaint, MM alleged that the expansion of the Liquid Audio board, its timing, and the Board's appointment of two new directors violated the principles of *Blasius* and *Unocal*. According to MM, that action frustrated MM's attempt to gain a "substantial presence" on the Board for at least one year and guaranteed that Liquid Audio's management will have control of, or a substantial presence on, the Board for at least two years.

### Board's Primary Purpose: Impede Effective Vote

The expedited trial was held by the Court of Chancery, as scheduled. During pretrial discovery, the Director Defendants identified the primary purpose of their action in expanding the Liquid Audio board from five to seven members. Their response to the following interrogatory request is illustrative:

6. Summarize the complete reasons that support the decision of the Board to amend the Bylaws or to approve the Bylaw Amendment.

*Response:* Subject to and without waiving the General Objections stated above, Defendants state that the Board of Directors, after receiving legal advice regarding their fiduciary duties, voted to expand the size of the board after a thorough and deliberate evaluation of the qualifications and expected contributions of Judith N. Frank and James D. Somes to Liquid's current operations and business plans. Furthermore, the Board of Directors believed that the Company would benefit from having seven directors instead of only five directors. In particular, the Company believed that it would benefit from creating new directorships and placing two additional outside directors on the board in light of the potential difficulties that may result from the addition of MM's nominees on the Board and in light of the possibility that one or more directors would decide to resign for a variety of reasons including, but not limited to, a reluctance to serve alongside a slate of directors proposed by MM ....

When defendant Doig was asked to elaborate upon this response to the interrogatory request, he testified:

There was concern that if the MM slate won and then it did become too acrimonious and that Ms. Winblad and Mr. Imbler decided to resign, that ran an undue risk to the shareholders by giving MM the ability to control the company.

The testimony of each other member of the Board also reflects that the Director

Defendants were concerned that incumbent directors Winblad and Imbler would resign from the Liquid Audio board if MM's nominees were elected to the board at the annual meeting, which would result in MM gaining control of the Board. The record also reflects that the timing of the Director Defendants' decision to expand the Board was to accomplish its primary purpose: to minimize the impact of the election of MM's nominees to the Board. The Court of Chancery's post-trial ruling from the bench states:

> The board's concern was that given the past acrimonious relationship between MM and Liquid Audio, a relationship characterized by litigation, if MM's two nominees were elected, the possibility of continued acrimony might cause one or more of the current board members to resign. If one director resigned, that would deadlock the board two-to-two; and if two directors resigned, then MM would gain control on a two-to-one basis. Either scenario could jeopardize the pending merger, which the incumbent board favored. That was the *primary* reason. (emphasis added).

After making that factual determination, the Court of Chancery recognized the effect of the Board's action in changing the size and composition of its membership immediately prior to the election of directors at the annual meeting:

> By adding two additional directors, the board foreclosed the result that it feared: The possibility of a deadlock or of MM taking control of the board. The

reason is that even if MM's two nominees were elected at the 2002 annual meeting, the current directors would still constitute a majority of five. The result of the board's action was to *diminish the influence of any nominees of MM* that were elected, at least in numerical terms.

Thus, based upon the evidence presented at trial, including an assessment of the witnesses' credibility, the Court of Chancery concluded that the Director Defendants amended the bylaws to expand the Board from five to seven, appointed two additional members of the Board, and timed those actions for the *primary purpose* of diminishing the influence of MM's nominees, if they were elected at the annual meeting.

### Corporate Governance Principles

■ The most fundamental principles of corporate governance are a function of the allocation of power within a corporation between its stockholders and its board of directors.[5] The stockholders' power is the right to vote on specific matters, in particular, in an election of directors. The power of managing the corporate enterprise is vested in the shareholders' duly elected board representatives.[6] Accordingly, while these "fundamental tenets of Delaware corporate law provide for a separation of control and ownership,"[7] the stockholder franchise has been characterized as the "ideological underpinning" upon which the legitimacy of the directors managerial power rests.[8]

---

5. That allocation of power has been and continues to be the subject of scholarly writings. *See, e.g.,* Lynn A. Stout, *Bad and Not So Bad Arguments For Shareholder Primacy,* 75 So. Cal. L.Rev. 1189 (2002); Stephen M. Bainbridge, *The Board of Directors as Nexus of Contracts,* 88 Iowa L.Rev. 1 (2002) and Lucian Ayre Bebchuk, *The Case Against Board*

*Veto in Corporate Takeovers,* 69 Univ. Chicago L.Rev. 973 (2002).

6. *Paramount Communications, Inc. v. Time, Inc.,* 571 A.2d 1140, 1154 (Del.1989).

7. *Malone v. Brincat,* 722 A.2d 5, 9 (Del.1998).

8. *Blasius Indus., Inc. v. Atlas Corp.,* 564 A.2d 651, 659 (Del.Ch.1988).

Maintaining a proper balance in the allocation of power between the stockholders' right to elect directors and the board of directors' right to manage the corporation is dependent upon the stockholders' unimpeded right to vote effectively in an election of directors. This Court has repeatedly stated that, if the stockholders are not satisfied with the management or actions of their elected representatives on the board of directors, the power of corporate democracy is available to the stockholders to replace the incumbent directors when they stand for re-election.[9] Consequently, two decades ago, this Court held:

> The Courts of this State will not allow the wrongful subversion of corporate democracy by manipulation of the corporate machinery or by machinations under the cloak of Delaware law. Accordingly, careful judicial scrutiny will be given a situation in which the right to vote for the election of successor directors has been *effectively frustrated* and denied.[10]

This Court and the Court of Chancery have remained assiduous in carefully reviewing any board actions designed to interfere with or impede the effective exercise of corporate democracy by shareholders, especially in an election of directors.[11]

### Corporate Governance Review Standards

■■■ The "defining tension" in corporate governance today has been characterized as "the tension between deference to directors' decisions and the scope of judicial review."[12] The appropriate standard of judicial review is dispositive of which party has the burden of proof as any litigation proceeds from stage to stage until there is a substantive determination on the merits.[13] Accordingly, identification of the correct analytical framework is essential to a proper judicial review of challenges to the decision-making process of a corporation's board of directors.[14]

■■■ The business judgment rule, as a standard of judicial review, is a common-law recognition of the statutory authority to manage a corporation that is vested in the board of directors. The business judgment rule is a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[15] An application of the

9. *Aronson v. Lewis,* 473 A.2d 805, 811 (Del. 1984). *Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946 (Del.1985).

10. *Giuricich v. Emtrol Corp.,* 449 A.2d 232, 239 (Del.1982).

11. *Unitrin, Inc. v. American Gen. Corp.,* 651 A.2d 1361, 1378 (Del.1995) (reviewing cases). *See also Blasius Indus., Inc. v. Atlas Corp.,* 564 A.2d 651, 659–61 (Del.Ch.1988) (collecting cases). *See also In re Gaylord Container Corp. Shareholders Litig.,* 753 A.2d 462 (Del. Ch.2000).

12. E. Norman Veasey, *The Defining Tension in Corporate Governance in America,* 52 Bus. Law. 393 (1997).

13. *Unitrin, Inc. v. American Gen. Corp.,* 651 A.2d 1361, 1371 (Del.1995). *See, e.g., Malp-*

*iede v. Townson,* 780 A.2d 1075 (Del.2001); *Emerald Partners v. Berlin,* 787 A.2d 85 (Del. 2001); *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1156 (Del.1995); *Kahn v. Lynch Communication Sys., Inc.,* 638 A.2d 1110 (1994).

14. *Unitrin, Inc. v. American Gen. Corp.,* 651 A.2d at 1374. *See also* Lewis H. Lazarus, *Standards of Review in Conflict Transactions: An Examination of Decisions Rendered on Motions to Dismiss,* 26 Del. J. Corp. L. 911 (2001).

15. *Unitrin, Inc. v. American Gen. Corp.,* 651 A.2d at 1373 quoting *Aronson v. Lewis,* 473 A.2d 805, 811 (Del.1984).

traditional business judgment rule places the burden on the "party challenging the [board's] decision to establish facts rebutting the presumption."[16] The effect of a proper invocation of the business judgment rule, as a standard of judicial review, is powerful because it operates deferentially. If the business judgment rule is not rebutted, a "court will not substitute its judgment for that of the board if the [board's] decision can be 'attributed to any rational business purpose.'"[17]

In *Blasius*, Chancellor Allen set forth a cogent explanation of why judicial review under the deferential traditional business judgment rule standard is inappropriate when a board of directors acts for the *primary* purpose of impeding or interfering with the effectiveness of a shareholder vote, especially in the specific context presented in *Blasius* of a contested election for directors:

> [T]he ordinary considerations to which the business judgment rule originally responded are simply not present in the shareholder voting context. That is, a decision by the board to act for the primary purpose of preventing the effectiveness of a shareholder vote inevitably involves the question who, as between the principal and the agent, has authority with respect to a matter of internal corporate governance. That, of course, is true in a very specific way in this case which deals with the question who should constitute the board of directors of the corporation, but it will be true in every instance in which an incumbent board seeks to thwart a shareholder majority. A board's decision to act to prevent the shareholders from creating a majority of new board positions and filling them does not involve the exercise of the corporation's power over its property, or with respect to its rights or obligations; rather, it involves allocation, between shareholders as a class and the board, of effective power with respect to governance of the corporation .... Action designed principally to interfere with the effectiveness of a vote inevitably involves a conflict between the board and shareholder majority. Judicial review of such action involves a determination of the legal and equitable obligations of an agent towards his principal. This is not, in my opinion, a question that a court may leave to the agent finally to decide so long as he does so honestly and competently; that is, it may not be left to the agent's business judgment.[18]

In *Blasius*, the Chancellor did not adopt a rule of *per se* invalidity once a plaintiff has established that a board of directors has acted for the primary purpose of interfering with or impeding the effective exercise of a shareholder vote.[19] Instead, the Chancellor concluded that such situations required enhanced judicial scrutiny, pursuant to which the board of directors "bears the heavy burden of demonstrating a compelling justification for such action."[20]

In *Blasius*, the Chancellor then applied that compelling justification standard of enhanced judicial review in examining a board's action to expand its size in the context of a contested election of directors, exactly what the Liquid Audio board did in this case. In *Blasius*, notwithstanding the

---

16. *Id.*

17. *Id.*, quoting *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del.1985) (citation omitted).

18. *Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651, 659–60 (Del.Ch.1988).

19. *Id.* at 662.

20. *Id.* at 661.

fact that the incumbent board of directors believed in good faith that the leveraged recapitalization proposed by the plaintiff was ill-advised and less valuable than the company's business plan, Chancellor Allen explained why the incumbent board of directors' good faith beliefs were not a proper basis for interfering with the stockholder franchise in a contested election for successor directors.

The only justification that can be offered for the action taken is that the board knows better than do the shareholders what is in the corporation's best interest. While that premise is no doubt true for any number of matters, it is irrelevant (except insofar as the shareholders wish to be guided by the board's recommendation) when the question is who should comprise the board .... It may be that the Blasius restructuring proposal was or is unrealistic and would lead to injury to the corporation and its shareholders if pursued .... The board certainly viewed it in that way, and that view, held in good faith, entitled the board to take certain steps to evade the risk it perceived. It could, for example, expend corporate funds to inform shareholders and seek to bring them to a similar point of view. But there is a vast difference between expending corporate funds to inform the electorate and exercising power for the primary purpose of foreclosing effective shareholder action. A majority of shareholders, who were not dominated in any respect, could view the matter differently than did the board. If they do, or did, they are entitled to employ the mechanisms provided by the corporation

law and the Atlas certificate of incorporation to advance that view.[21]

In *Blasius,* the Chancellor set aside the board's action to expand the size of its membership for the primary purpose of impeding and interfering with the effectiveness of a shareholder vote in a contested election for directors. In this case, not only did the Liquid Audio board of directors take similar action in expanding the size of its membership and appointing two new directors to fill those positions, but it took that action for the same *primary* purpose.

### Compelling Justification Within Unocal

The *Blasius* compelling justification standard of enhanced judicial review is based upon accepted and well-established legal tenets.[22] This Court and the Court of Chancery have recognized the substantial degree of congruence between the rationale that led to the *Blasius* "compelling justification" enhanced standard of judicial review and the logical extension of that rationale *within* the context of the *Unocal* enhanced standard of judicial review.[23] Both standards recognize the inherent conflicts of interest that arise when a board of directors acts to prevent shareholders from effectively exercising their right to vote either contrary to the will of the incumbent board members generally or to replace the incumbent board members in a contested election.

In *Gilbert,* we held that a reviewing court must apply the *Unocal* standard of review whenever a board of directors adopts any defensive measure "in response to some threat to corporate policy and effectiveness which touches upon issues of

---

**21.** *Id.* at 663.

**22.** *Stroud v. Grace,* 606 A.2d 75, 91 (Del. 1992).

**23.** *Id.* at 91. *Chesapeake Corp. v. Shore,* 771 A.2d 293, 320 (Del.Ch.2000). *See also* David C. McBride and Danielle Gibbs, *Voting Rights: The Metaphysics of Blasius Industries v. Atlas Corp.,* 26 Del. J. Corp. L. 927 (2001).

control."[24] Later, in *Stroud*, this Court acknowledged that board action interfering with the exercise of the shareholder franchise often arises during a hostile contest for control when an acquiror launches both a proxy fight and a tender offer.[25] Accordingly, in *Stroud*, we held that "such action necessarily invoked both *Unocal* and *Blasius*."[26]

In *Stroud*, we emphasized, however, that the *Blasius* and *Unocal* standards of enhanced judicial review ("tests") are *not* mutually exclusive.[27] In *Stroud*, we then explained why our holding in *Gilbert* did not render *Blasius* and its progeny meaningless:

> In certain circumstances, a court must recognize the special import of protecting the shareholders' franchise within *Unocal's* requirement that any defensive measure be proportionate and "reasonable in relation to the threat posed." A board's unilateral decision to adopt a defensive measure touching "upon issues of control" that purposefully disenfranchises its shareholders is strongly suspect under *Unocal*, and cannot be sustained without a "compelling justification."[28]

■ Thus, the same circumstances must be extant before the *Blasius* compelling justification enhanced standard of judicial review is required to sustain a board's action either independently, in the absence of a hostile contest for control, or within

the *Unocal* standard of review when the board's action is taken as a defensive measure. The "compelling justification" standard set forth in *Blasius* is applied independently or within the *Unocal* standard only where "the primary purpose of the board's action is to interfere with or impede exercise of the shareholder franchise and the shareholders are not given a full and fair opportunity to vote" effectively.[29] Accordingly, this Court has noted that the non-deferential *Blasius* standard of enhanced judicial review, which imposes upon a board of directors the burden of demonstrating a compelling justification for such actions, is rarely applied either independently or within the *Unocal* standard of review.[30]

In *Unitrin*, for example, although the board's action in adopting a repurchase program was a defensive measure that implicated the shareholders' franchise and called for an application of the *Unocal* standard of review, it did not require the board to demonstrate a compelling justification for that action.[31] In *Unitrin*, the primary purpose of the repurchase program was not to interfere with or impede the shareholders' right to vote; the shareholders' right to vote effectively remained extant; and, in particular, we noted that the shareholders retained sufficient voting power to challenge the incumbent board by electing new directors with a successful proxy contest.[32]

24. *Gilbert v. El Paso Co.*, 575 A.2d 1131, 1144 (Del.1990).

25. *Stroud v. Grace*, 606 A.2d at 92 n. 3.

26. *Id.*

27. *Id.*

28. *Id.*

29. *Williams v. Geier*, 671 A.2d 1368, 1376 (Del.1996) quoting *Stroud v. Grace*, 606 A.2d 75, 92 (Del.1992).

30. *Id.*

31. *Unitrin, Inc. v. American Gen. Corp.*, 651 A.2d 1361 (Del.1995).

32. *Id.* at 1382–83. With regard to shareholder rights plans, it has been stated that: "Indeed, the Delaware courts, at the same time that they seemed to be giving license to boards to maintain the pill indefinitely and otherwise block a bid, also indicated that they would protect against managerial moves to impede voting by shareholders to remove

■ In this case, however, the Court of Chancery was presented with the ultimate defensive measure touching upon an issue of control. It was a defensive action taken by an incumbent board of directors for the primary purpose of interfering with and impeding the effectiveness of the shareholder franchise in electing successor directors. Accordingly, the incumbent board of directors had the burden of demonstrating a compelling justification for that action to withstand enhanced judicial scrutiny *within* the *Unocal* standard of reasonableness and proportionality.

### Unocal Required Compelling Justification

This case presents a paragon of when the compelling justification standard of *Blasius* must be applied within *Unocal*'s requirement that any defensive measure be proportionate and reasonable in relation to the threat posed. The *Unocal* standard of review applies because the Liquid Audio board's action was a "defensive measure taken in response to some threat to corporate policy and effectiveness which touches upon issues of control." [33] The compelling justification standard of *Blasius* also had to be applied *within* an application of the *Unocal* standard to that specific defensive measure because the primary purpose of the Board's action was to interfere with or impede the effective exercise of the shareholder franchise in a contested election for directors.[34]

■ The Court of Chancery properly decided to examine the Board's defensive action to expand from five to seven members and to appoint two new members in accordance with the *Unocal* standard of enhanced judicial review. Initially, the Court of Chancery concluded that defensive action was not preclusive or coercive. If a defensive measure is not draconian, because it is neither coercive nor preclusive, proportionality review under *Unocal* requires the focus of enhanced judicial scrutiny to shift to the range of reasonableness.[35]

After the Court of Chancery determined that the Board's action was not preclusive or coercive, it properly proceeded to determine whether the Board's action was reasonable and proportionate in relation to the threat posed.[36] Under the circumstances presented in this case, however, the Court of Chancery did not "recognize the special [importance] of protecting the shareholder's franchise within *Unocal*'s requirement that any defensive measure be proportionate and reasonable in relation to the threat posed." [37] Since the Court of Chancery had already concluded that the *primary* purpose of the Liquid Audio board's defensive measure was to interfere with or impede an effective exercise of the shareholder's franchise in a contested election of directors, the Board had the burden of demonstrating a compelling justification for that action.

them." Lucian Arye Bebchuk, John C. Coates, IV & Guhan Subramanian, *The Powerful Antitakeover Force of Staggered Boards: Theory, Evidence, and Policy*, 54 Stanford L.Rev. 887, 907 (2002).

33. *Gilbert v. El Paso Co.*, 575 A.2d 1131, 1144 (Del.1990).

34. *Stroud v. Grace*, 606 A.2d 75, 92, n. 3 (Del.1992).

35. *Unitrin, Inc. v. American Gen. Corp.*, 651 A.2d 1361, 1387–88 (Del.1995).

36. In our review of the Court of Chancery's *Unocal* analysis, we have assumed without deciding that the Board was independent and had reasonable grounds for believing that there was a danger to corporate policy.

37. *Stroud v. Grace*, 606 A.2d at 92 n. 3.

 When the *primary purpose* of a board of directors' defensive measure is to interfere with or impede the effective exercise of the shareholder franchise in a contested election for directors, the board must first demonstrate a compelling justification for such action as a condition precedent to any judicial consideration of reasonableness and proportionately.[38] As this case illustrates, such defensive actions by a board need not actually prevent the shareholders from attaining any success in seating one or more nominees in a contested election for directors and the election contest need not involve a challenge for outright control of the board of directors.[39] To invoke the *Blasius* compelling justification standard of review *within* an application of the *Unocal* standard of review, the defensive actions of the board only need to be taken for the primary purpose of interfering with or impeding the effectiveness of the stockholder vote in a contested election for directors.

### Board Expansion Invalid

 The record reflects that the primary purpose of the Director Defendants' action was to interfere with and impede the effective exercise of the stockholder franchise in a contested election for directors. The Court of Chancery concluded that the Director Defendants amended the bylaws to provide for a board of seven and appointed two additional members of the Board for the primary purpose of diminishing the influence of MM's two nominees on a five-member Board by eliminating either the possibility of a deadlock on the board or of MM controlling the Board, if one or two Director Defendants resigned from the Board. That defensive action by the Director Defendants compromised the essential role of corporate democracy in maintaining the proper allocation of power between the shareholders and the Board, because that action was taken in the context of a contested election for successor directors. Since the Director Defendants did not demonstrate a compelling justification for that defensive action, the bylaw amendment that expanded the size of the Liquid Audio board, and permitted the appointment of two new members on the eve of a contested election, should have been invalidated by the Court of Chancery.

 One of the most venerable precepts of Delaware's common law corporate jurisprudence is the principle that "inequitable action does not become permissible simply because it is legally possible." [40] At issue in this case is not the validity generally of either a bylaw that permits a board of directors to expand the size of its membership or a board's power to appoint successor members to fill board vacancies. In this case, however, the incumbent Board timed its utilization of these otherwise valid powers to expand the size and composition of the Liquid Audio board for the primary purpose of impeding and interfering with the efforts of the stockholders' power to effectively exercise their voting rights in a contested election for directors. As this Court held more than three decades ago, "these are inequitable purposes, contrary to established principles of corporate democracy ... and may not be permitted to stand." [41]

### Conclusion

The judgment of the Court of Chancery is reversed. This matter is remanded for

---

**38.** *Id.*

**39.** *See IBS Fin. Corp. v. Seidman and Assocs., L.L.C.,* 136 F.3d 940, 951 (3d Cir.1998).

**40.** *Schnell v. Chris–Craft, Indus., Inc.,* 285 A.2d 437, 439 (Del.1971).

**41.** *Id.*

further proceedings in accordance with this opinion. The mandate shall issue immediately.[42]