**In re The MONY GROUP, INC. SHAREHOLDER LITIGATION.**

C.A. No. 20554.

Court of Chancery of Delaware.
New Castle County.

Submitted: April 6, 2004.
Decided: April 9, 2004.
Filed: April 12, 2004.
Revised: April 14, 2004.

Joseph A. Rosenthal, Carmella P. Keener, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware; Steven G. Schulman, Seth D. Rigrodsky, Ralph N. Sianni, Joseph N. Gielata, Milberg Weiss Bershad Hynes & Lerach LLP, Wilmington, Delaware and New York, New York; U. Seth Ottensoser, Timothy J. MacFall, Gregory M. Engelson, Bernstein Liebhard & Lifshitz, LLP, New York, New York; Emily C. Komlossy, Lynda Grant, Goodkind Labaton Rudoff & Sucharow LLP, New York, New York; Stephen T. Rodd, James S. Notis, Evan J. Kaufman, Abbey Gardy, LLP, New York, New York; for the Plaintiffs.

Allen M. Terrell, Jr., J. Travis Laster, Thad J. Bracegirdle, David A. Felice, Lisa A. Schmidt, Richards, Layton & Finger, P.A., Wilmington, Delaware; Harvey Kurzweil, Richard W. Reinthaler, James P. Smith, III, John E. Schreiber, Dewey Ballantine LLP, New York, New York, for The Mony Defendants.

David McBride, Adam W. Poff, Martin Lessner, Young Conaway Stargatt & Taylor LLP, Wilmington, Delaware; John H. Hall, Jeffrey I. Lang, Erik Bierbauer, Debevoise & Plimpton LLP, New York, New York, for Defendants AXA Financial, Inc. and AIMA Acquisition Co.

## OPINION

LAMB, Vice Chancellor.

### I.

On February 17, 2004, the court granted a preliminary injunction against a stockholder vote on a proposed merger agreement pending supplemental disclosures concerning payments under officer change-in-control agreements. A week later, the defendant directors postponed until May 18, 2004 the stockholder meeting at which the vote was scheduled to take place and established a new record date of April 8, 2004. The plaintiffs now allege that in doing so, the defendant board deliberately acted to frustrate the stockholder franchise. The plaintiffs also allege that certain disclosures in the supplemental proxy statement are misleading and that the MONY defendants' plan to vote proxies received before the February 17 decision is both unauthorized and inequitable. The majority of these "old" cards were voted in favor of the merger.

The plaintiffs seek an injunction sterilizing the defendants' votes (which constitute approximately 7% of the outstanding shares), requiring the defendants to make corrective disclosures, and invalidating all old proxies.[1] After carefully considering the record before it, the court finds that a disinterested and independent majority of

---

1. Because the court denies any relief, it has no occasion to consider what particular form of relief might be appropriate in the circumstances of this case. Nevertheless, the court is unaware of any precedent that would support the plaintiffs' suggestion that this court should consider sterilizing the voting power of shares in situations of this kind.

the defendant directors acted in accordance with their fiduciary duties when they postponed the meeting and set a new record date. Because that decision is not the product of any inequity or unfairness, but rather is one that permits a full and fair vote, the court will review it under the business judgment rule.

The court determines that, as a matter of law, the "old" proxies empower the proxy holders to vote at the postponed meeting. Because the record is incomplete, however, the court is unable to reach any conclusion about the equitable challenges to the use of those proxies at this time, other than to deny an injunction on that basis. Finally, the court concludes that the claims attacking the disclosure in the revised proxy statement lack merit, as they are either factually unsupported or would improperly require the defendant directors to characterize their actions and decisions.

## II.

█ The oft-cited standard for granting a preliminary injunction is well known. The party seeking a preliminary injunction "must establish that there is a reasonable probability of success on the merits, that irreparable harm will result if an injunction is not granted, and that the balance of equities favors the issuance of the injunction." [2]

## III.

### A. The Parties

Defendant MONY is a publicly traded Delaware corporation engaged in the life insurance business. Defendants Tom H. Barrett, David L. Call, G. Robert Durham, Robert Holland, Jr., James L. Johnson, Robert R. Kiley, Jane C. Pfeiffer, Thomas C. Theobald, Frederick W. Kanner, David M. Thomas, and Margaret M. Foran are outside directors of MONY (the "Outside Directors"). Defendants Michael I. Roth, Samuel J. Foti, and Kenneth M. Levine are inside directors (the "Inside Directors," together with the Outside Directors, the "Board"). Roth is the Chairman and CEO of MONY, Foti is MONY's President and Chief Operating Officer, and Levine is Executive Vice President and Chief Investment Officer of MONY.

Defendant AXA is a Delaware corporation also engaged in the insurance industry. AXA is a wholly owned subsidiary of AXA, S.A., a French corporation. AIMA Acquisition Co. is a wholly owned Delaware subsidiary of AXA created solely to affect the proposed merger.

The plaintiffs, who seek to act as class representatives for all holders of MONY common stock other than the defendants, are MONY common stockholders who have continuously owned MONY common stock during the relevant period. The plaintiffs are E.M. Capital, Inc., Elm Realty, Inc., Congregate Investors, Ltd., Abbot Hill Partners, L.P., Alan Martin, Amanda Kahn–Kirby, The Jewish Foundation for Education of Women, Edward Cantor, and Jerome Muskal.

### B. MONY/AXA Merger And Its Financing

On September 17, 2003, MONY and AXA executed and publicly announced a merger agreement. Under certain change-in-control agreements ("CICs"), management of MONY stood to gain approximately $79 million if the merger consummated, of which amounts the three Inside Directors would receive about $47 million.

The agreement provided for a $31 per share all cash acquisition of MONY by AXA. In order to finance this transaction,

---

**2.** In re Aquila, Inc. S'holders Litig., 805 A.2d 184, 189 (Del.Ch.2002).

AXA issued convertible debt securities known as "ORANs" to its stockholders.[3] These ORANs will convert into AXA shares on completion of the acquisition. The ORANs were issued at Q12.75, which was a 23% discount to AXA's closing price on September 17, 2003. Should the acquisition not be completed by December 21, 2004, the ORANS will be redeemed at face value plus interest at 2.4% per annum. Since the ORANS were issued, the market price of AXA stock has increased. Thus, persons who hold long positions in ORANs stand to gain a large profit on that investment if the MONY/AXA merger is consummated. Conversely, arbitrageurs who sell ORANs short stand to gain if that same merger is not completed.

### C. The Court's February 17, 2004 Decision

The plaintiffs previously requested a preliminary injunction against the stockholder vote alleging that the Board did not fulfill its *Revlon*[4] duty to seek the best transaction reasonably available to stockholders, that the Board's decision following negotiation that the merger proposal was the best proposal reasonably available was flawed, and that certain disclosures made in a proxy statement sent out to stockholders of MONY in anticipation of the stockholder vote were misleading. In a February 17, 2004 opinion (the "Opinion"),[5] the court held, on the basis of the preliminary record before it, that the Board did indeed meet all of its obligations under *Revlon*, and that its decision that the merger pro-

posal was the best proposal reasonably available was a valid decision within the discretion of the Board. The court did, however, grant a limited injunction, relating solely to proxy statement disclosures concerning payments under the CICs held by officers of MONY. In the Opinion, the court gave guidance as to what disclosures were necessary to comply with the Opinion:

> As recently as September 9, 2003, the Compensation Committee reviewed comparative information about CICs in comparable transactions. That information, together with information presented to the Board at its September 17, 2003 meeting should give stockholders meaningful information about the relationships between the CICs and the $31 per share merger price.[6]

The Opinion also discussed two letters sent from Lincoln Financial Group to MONY expressing interest in exploring a combination with MONY.[7] The court rejected the plaintiffs' arguments that more information regarding these two letters had to be disclosed.

### D. Increase In Trading Volume And Its Effect On The Vote

MONY has approximately 50 million shares of stock outstanding.[8] In the nine trading days of September 2003 following the announcement of the merger agreement, the average daily trading volume for MONY shares was 1,797,078 shares. In the remaining three months of 2003, the average daily trading volume declined to 326,535; 175,741; and 131,832, respectively.[9]

---

**3.** *See* Transmittal Aff. of U. Seth Ottensoser in Supp. of Pls.' Second Mot. for a Prelim. Inj. ("Ottensoser Aff.") at Ex. 13 (Press Release Discussing ORANs). AXA stockholders were allowed to purchase one ORAN for every 16 shares of stock held. *Id.*

**4.** *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del.1986).

**5.** *In re The MONY Group, Inc. S'holder Litig.*, 852 A.2d 9 (Del.Ch.2004).

**6.** *Id.* at 26 n. 44 (citations omitted).

**7.** *See id* at 18.

**8.** *See* Ottensoser Aff. Ex. 36, at DFK–0084.

**9.** Aff. of Peter C. Harkins ("Harkins Aff.") at ¶ 10.

For reasons not completely explained in the record, trading activity in MONY shares increased dramatically after the original January 2, 2004 record date. Between the beginning of the year and February 13, 2004, the average daily trading volume jumped to 426,050. During the five-day period beginning February 17, 2004, nearly 15 million shares were traded.[10] All told, trading in MONY shares after the record date, up until February 20, 2004, amounted to approximately 52% of the total number of MONY common shares outstanding.[11]

This pattern of heavy trading gave rise to increasing concern on the part of MONY is proxy solicitor, D.F. King & Co., that MONY would be unable to secure the votes necessary to approve the merger. There are several reasons for this, as explained in the Affidavit of Peter C. Harkins, King's President and CEO. First, when shares trade in the market, they generally trade without a proxy, so that the person acquiring the shares does not obtain the right to vote those shares on the merger. Instead, the power to vote remains with the seller who was the record date holder. Second, persons who sell shares frequently do not vote them. Indeed, many institutional stockholders have a policy against voting shares they no longer own. Thus, the unusually heavy trading volume beginning immediately after the original record date was likely to reduce the pool of potential voters. This, in turn, led to an increase in the percentage of votes *actually cast* that would have to be in favor of the AXA merger in order to obtain the requisite absolute majority of shares outstanding as of the record date.[12]

For example, on February 17, 2004, when this court was issuing the Opinion, only 53.7% of MONY's outstanding shares had been voted. MONY had received "yes" proxies from 58% of the votes actually cast, but these accounted for only 31.3% of the outstanding shares of MONY. This left the merger proposal 18.8% or 9,402,-433 votes shy of passing.[13] Given the substantial turnover, and the known opposition of four large investors, including Highfields Capital Management L.P., who collectively controlled 13.6% of MONY's outstanding shares,[14] the probability of obtaining that vote was increasingly uncertain.

### E. Reasons For Increase In Trading Volume

The plaintiffs claim that the "defendants knew that an anomalous increase in trading in MONY shares was due to holders of ORANs who were purchasing MONY stock at a premium specifically to vote for the merger and obtain a huge return on their ORAN investment at the expense of MONY shareholders."[15] They also suggest that the surge in volume was due to tipping by MONY executives of the decision to set a new record date. The record of this proceeding contains several e-mails indicating knowledge on the part of management that those long in ORANs were purchasing MONY stock.[16] However, the record does not support an inference that management tipped these holders to a change in the record date.[17] At oral argument, the plaintiffs' counsel conceded that

---

10. Ottensoser Aff. Ex. 28.

11. Harkins Aff. ¶ 18.

12. *See* 8 *Del. C.* § 251(c) (requiring a majority of outstanding stock of a corporation to be voted in favor of a merger).

13. Ottensoser Aff. Ex. 11.

14. Harkins Aff. ¶ 7.

15. Pls.' Opening Br. in Supp. of their Second Mot. for a Prelim. Inj. ("Pls.' Opening Br.") at 8.

16. *E.g.,* Ottensoser Aff. Exs. 15, 16, 18.

17. *See* Pls.' Opening Br. at 14 ("While these individuals testified that they only 'listened,' that was enough to encourage speculation that MONY would change the record date."),

they did not find any evidence of such "tipping."

While the speculative purchase of MONY stock by those long in ORANs is undoubtedly *one* reason for the increase in trading volume of MONY shares, it is not *the sole* reason. Other likely reasons for an increase in trading include the Opinion enjoining the stockholder vote, a downgrade in MONY's credit rating by S & P,[18] a change of review status of MONY by A.M. Best,[19] the disclosure in the Opinion of the Lincoln Financial Group letters, AXA's February 17 announcement that it would not raise its offer for MONY, and certain institutional voting advisory firm announcements recommending against a vote for the merger.

Moreover, it is not clear that those long ORANs were the only ORAN holders involved in trading MONY stock. As noted by various media services, Schwartz,[20] and CSFB, the Board's independent financial advisor,[21] those who are short ORANs are incentivized to acquire MONY shares in order to impede the AXA/MONY transaction. Indeed, Highfields, a hedge fund that publicly filed a letter with this court urging it to enjoin MONY from changing the record date (presumably to ensure that the merger was not approved) has an equity stake just short of 5% in MONY, and has a large short position in ORANs.

Thus the plaintiffs have not established either that those long ORANs (or any arbitrageur purchasing MONY shares solely to vote in favor of the proposal) were the sole, or even primary, reason for the increase in trading volume of MONY shares; that such people were tipped to a change in the record date by the Board; or that the increase in trading volume led to a pool of stockholders who were definitively more likely to vote in favor of the merger proposal.

**F.** *MONY And AXA Amend The Merger Agreement And Announce The Delay Of The February 24, 2004 Meeting*

Following the issuance of the Opinion, Roth and AXA CEO Christopher Condron discussed modifications to the merger agreement. The outcome of these negotiations was that recipients of the CICs would forego certain restricted stock options valuing $7.4 million, with the resultant savings being used to fund a special dividend of $.10 per share that would be payable to stockholders of record immediately prior to closing. AXA also agreed to raise the trigger for the "appraisal out" condition to the merger agreement—allowing AXA to walk away from the deal if a certain percentage of MONY stockholders demanded appraisal—from 10% to 15%. Further, AXA agreed that in the event the "appraisal out" is triggered, it will decide whether or not to waive that condition within five business days of the date on which all other conditions to the merger agreement are satisfied.[22]

see also Ottensoser Aff. Ex. 15 (e-mail from Thomas Stoddard stating, "I'm willing to listen but would not respond to questions about MONY's intentions or timing"); *id.* Ex. 18 (e-mail from Bart Schwartz, general counsel of MONY, stating "my general policy is not to take calls from arbs but, sometimes, when they tell me they just want to talk and not to ask questions, I will take the call and just listen. Of course, I never implicitly or explicitly convey any non-public information.").

**18.** Transmittal Aff. of Thad J. Bracegirdle in Supp. of the MONY Defs.' Opp'n to Pls.' Mot. for a Second Prelim. Inj. ("Bracegirdle Aff.") at Ex. 3.

**19.** *Id.* Ex. 11.

**20.** *See id.* Ex. 12.

**21.** *See* Ottensoser Aff. Ex. 27, at MONY 32693.

**22.** This modification eliminated what was essentially an open-ended option. In the merger's first incarnation, once the appraisal out

The Board discussed these changes in a February 18, 2004 telephonic meeting. At this meeting, Roth discussed the Opinion and advised the Board that because of the Opinion and need for supplemental disclosures, the special stockholders' meeting scheduled for February 24 would have to be rescheduled.[23] The Board also discussed the changes to the merger agreement. After this meeting, MONY issued a press release citing the Opinion and announcing that the special stockholders' meeting would not go forward and a new meeting date would be announced shortly.[24]

### G. *The February 22, 2004 Board Meeting And Changing The Record Date*

On February 22, 2004, the Board met to discuss the circumstances surrounding the merger. At this meeting, the Board received presentations from CSFB, D.F. King, and outside legal counsel.[25] Lawyers from Dewey Ballantine and Richards, Layton & Finger, MONY's outside counsel, reviewed the legal principles applicable to the Board's meeting and the status of

litigation in this court.[26] CSFB's presentation again indicated it would issue a fairness opinion in regard to the merger.[27]

King's presentation, made by Harkins, discussed the effect of the increased trading and recommended establishing April 8, 2004 as the new record date and May 18, 2004 as the new date for the special stockholder meeting.[28] During this presentation, the Board discussed who might buy MONY shares in the time period between the announcement of the new record date and the date itself. Harkins discussed the effect of arbitrageurs' trading in, and accumulation of, MONY shares, specifically those long and *short* ORANs.[29]

Having received the reports, the Board discussed the likely effect on shareholder value based on several hypotheticals proposed by Theobald, an outside director.[30] The Board discussed options if the merger was not approved: (1) firing senior management and bringing in a new team; (2) keeping the current management team and engaging in further cost-cutting actions; or (3) selling the Company in pieces. The Board then compared estimated stockholder value under these alternatives with the value of the merger.[31] Following discus-

---

was triggered, AXA could walk away from the deal at any time prior to closing. The time period for AXA to act is now extremely limited.

23. Aff. of Thomas C. Theobald ("Theobald Aff.") at ¶ 2.

24. Ottensoser Aff. Ex. 29 ("MONY indicated that its decision to reschedule the meeting of stockholders was in response to an opinion issued on February 17, 2004 by the Delaware Court of Chancery requiring MONY to revise its proxy statement to include additional disclosure relating to its change-of-control agreements with its senior executives.").

25. Ottensoser Aff. Ex. 33 (Board Meeting Minutes).

26. *Id.* at MONY 32652–53.

27. *Id.* at MONY 32655.

28. *Id.* At MONY 32656

29. Harkins Aff. ¶ 25. In its presentation, CSFB also discussed potential arbitrage activity among ORAN holders. It noted that as of the Board meeting, anyone long ORANs would receive an approximate 46% profit if the merger was consummated, compared to a 2.4% profit if it was not. Further, it stated, "[s]ince MONY's disposition will determine the value of the ORANs, a portion of the trading activity in MONY's shares probably is related to activity in the ORANs. Investors with long positions in the ORANs have incentives to acquire MONY shares in support of the AXA/MONY transaction. Investors with short positions in the ORANs also have incentives to acquire MONY shares to impede the AXA/MONY transaction." *Id.* Ex. 27 at MONY 32693.

30. Theobald Aff. ¶ 10.

31. *See Id.* ¶¶ 6–13.

sions with executive management and CSFB, the Board concluded that none of those possibilities would be likely to result in stockholder value approaching the value that the MONY stockholders would receive in the proposed merger.[32] The Board thus determined that the revised merger was in the best interests of the MONY stockholders and proceeded to approve it.

The Board then considered whether or not to change the record date. While the Board was partially driven by a desire to enfranchise MONY's current stockholders (who are undoubtedly quite a different group from MONY's stockholders as of the old record date) in the face of a stale record date,[33] it is abundantly clear that the Board made its decision with an eye on approval of the merger. Indeed, MONY's answering brief states: "Did the Board [change the record date] with the understanding and belief that setting a new record date would improve the chance that the Merger would receive the requisite

approval of the majority of stockholders? Yes, it did."[34]

The Board believed that changing the record date would increase the possibility of the merger getting approved in two ways. First, it would likely increase the percentage of votes cast, thus decreasing the percentage of "yes" votes needed from that group to achieve a majority. Second, the Board surmised that the stockholders of record as of the new record date would be more inclined to vote in favor of the merger than the stockholders of record as of the old record date.

Thus the Board, acting with a purpose of increasing the likelihood of a favorable vote, approved the change of record and meeting date. The Board–a Board that during the course of negotiations repeatedly demonstrated its independence from management[35]—did so by unanimous vote, with the three Inside Directors abstaining.[36]

---

**32.** *Id.* ¶ 11 ("In view of the challenges the Company was facing (including the virtual certainty of additional downgrades if the Merger were not consummated), I believed that, if the proposed Merger were not consummated, there was a significant likelihood that the Company would decline in value, probably by a significant percentage of the $31.35 that the MONY stockholders would otherwise receive in the Merger.").

**33.** *See* Ottensoser Aff. Ex. 33. Section 213 of the General Corporation Law states that the record date set by a board of directors "shall not be more than 60 days nor less than 10 days before" the stockholder meeting. 8 *Del. C.* § 213(a). The purpose of this section is to facilitate notice to stockholders of a stockholder meeting. *See Pabst Brewing Co. v. Jacobs,* 549 F.Supp. 1068 (D.Del.1982), *aff'd,* 707 F.2d 1392 (3d Cir.1982) (quoting *Bryan v. W. Pac. R.R. Corp.,* 35 A.2d 909 (1944), and stating that "the underlying purpose of" section 213 is to " 'facilitate reasonable methods of notification.' "). Stale record dates, which necessarily involve a longer time between record date and meeting date during which ben-

eficial ownership changes hands, act to disenfranchise those who acquire their shares after the record date.

**34.** Defs.' Answering Br. in Opp'n to Pls.' Second Mot. for a Prelim. Inj. ("Defs.' Answering Br.") at 2. Harkin's affidavit also attests to this: "It was obvious to me at the Board Meeting that the Board decided to change the record date in the hope and with the expectation that the change would result in a shareholder mix that was more likely to vote in favor of the merger than the mix that existed on the Initial Record Date.... I advised the Board that a change to the record date would be beneficial for MONY and its current owners by increasing the likelihood that the merger would be approved by the requisite vote of stockholders." Harkins Aff. ¶ 25.

**35.** *See In re The MONY Group Inc. S'holder Litig.,* 852 A.2d 9, 20 ("[T]he Board repeatedly demonstrated its independence and control.").

**36.** Ottensoser Aff. Ex. 33, at MONY 32661.

## H. *Use Of Old Proxies*

On March 30, 2004, MONY filed revised proxy materials with the SEC. These materials indicate that MONY intends to vote proxies received for the cancelled February 24, 2004 special stockholders' meeting at the May 18, 2004 special stockholders' meeting. Specifically, MONY's preliminary proxy statement says:

> If you previously submitted a proxy for the special meeting of stockholders originally scheduled for February 24, 2004, which proxy has not subsequently been revoked, and are a holder of record on April 8, 2004, MONY intends to vote those proxies at the rescheduled special meeting of stockholders on May 18, 2004.[37]

Fifty-eight percent of the proxies in hand were voted in favor of the original merger agreement.[38]

This action has been challenged by the plaintiffs both on the technical ground that the previously submitted proxies do not allow their use at the May 18, 2004 meeting and on the ground that such use would be inequitable. The record does not reflect that the Board was informed of, or considered, this decision.

## IV.

■ The shareholder franchise occupies a special place in Delaware corporation law, and our courts are vigilant in policing fiduciary misconduct that has the effect of impeding or interfering with the effectiveness of a stockholder vote.[39] This is particularly the case in matters relating to the election of directors or involving issues of directorial control.[40] In other matters in which directors submit proposals to a stockholder vote, the courts maintain vigilance to ensure that the voting process, which is largely controlled by the board of directors, allows the stockholders a full and fair opportunity to vote.[41]

### A. *The Stockholder Franchise In The Election Context*

■ In the election of directors context, it has been noted "[t]he shareholder franchise is the ideological underpinning upon which the legitimacy of directorial power rests."[42] Boards of directors of Delaware corporations control large amounts of capital of which the stockholders are equitable owners. This court, relying on the General Assembly's determination that "[t]he business and affairs of every corporation

---

**37.** *Id.* Ex. 2, at ii, iv, 5, 16, 20.

**38.** *Id.* Ex. 36; *id.* Ex. 11, at DKF–0082.

**39.** *See, e.g., MM Cos. v. Liquid Audio, Inc.,* 813 A.2d 1118, 1127 (Del.2003) ("This Court and the Court of Chancery have remained assiduous in carefully reviewing any board actions designed to interfere with or impede the effective exercise of corporate democracy by shareholders, especially in an election of directors."); *Schnell v. Chris–Craft Indus., Inc.,* 285 A.2d 437, 439–40 (Del.1971) ("[S]tockholders may not be charged with the duty of anticipating inequitable action by management, and of seeking anticipatory injunctive relief to foreclose such action, simply because the new Delaware Corporation Law makes such inequitable action legally possible.").

**40.** *See, e.g., Liquid Audio,* 813 A.2d at 1127 ("[C]areful judicial scrutiny will be given a situation in which the right to vote for the election of successor directors has been *effectively frustrated* and denied."); *Blasius Indus. Inc. v. Atlas Corp.,* 564 A.2d 651, 660 (Del.Ch. 1988) (noting that issues involving the stockholder franchise are implicated "in a very specific way in [cases] which deal[] with the question who should constitute the board of directors of the corporation").

**41.** *See e.g. State of Wisconsin Inv. Bd. v. Peerless Sys. Corp.,* 2000 WL 1805376, 2000 Del. Ch. LEXIS 170 (Del.Ch. Dec. 4, 2000).

**42.** *Blasius Indus., Inc.,* 564 A.2d at 654.

... shall be managed by or under the direction of a board of directors,"[43] in most circumstances defers to decisions made by boards of directors in how to run the corporation's affairs. Noting this usual deference, Chancellor Allen wrote, "[g]enerally, shareholders have only two protections against perceived inadequate business performance. They may sell their stock ... or they may vote to replace incumbent board members."[44]

Thus, this court has held that in the context of the election of directors, "[a]ction designed principally to interfere with the effectiveness of a [shareholder] vote," even if that action is taken in good faith, honestly, and competently, is not action that may "be left to the [board's] business judgment."[45] For example, in *Blasius Industries, Inc. v. Atlas Corp.,* a company's board of directors, acting in what the court deemed "a good faith effort to protect its incumbency, not selfishly, but in order to thwart implementation of [a] recapitalization that it reasonably feared, would cause great injury to the Company,"[46] was nevertheless found to have unintentionally violated its fiduciary duty of loyalty. The court held that, regardless of the board's good intentions, because its action was designed with the principal purpose of preventing shareholders from electing a majority of new directors, it had to present a "compelling justification" for taking such action.[47] Noting the stringency of this standard of review, the Supreme Court has

stated that *Blasius* review is rarely applied.[48]

B. *The Stockholder Franchise Outside The Election Context*

*Blasius* involved a contest to elect a new board majority and draws its strong doctrinal justification from that context. It is in that context that the pivotal question that Chancellor Allen identified—"the question who, as between the principal and the agent, has authority with respect to a matter of internal corporate governance"[49] —is most heavily implicated. This is not to say that the stockholder franchise outside the election context is at all unimportant. Although Chancellor Allen noted that, while the question of power allocation is central in a "very specific way" when dealing with the "question who should constitute the board of directors of the corporation," it is "true in every instance in which an incumbent board seeks to thwart a shareholder majority."[50]

Nevertheless when the matter to be voted on does not touch on issues of directorial control, courts will apply the exacting *Blasius* standard sparingly, and only in circumstances in which self-interested or faithless fiduciaries act to deprive stockholders of a full and fair opportunity to participate in the matter and to thwart what appears to be the will of a majority of the stockholders, as in *State of Wisconsin Investment Board v. Peerless Systems Corporation.*[51] Where such circumstances

---

43. 8 *Del. C.* § 141(a).

44. *Blasius Indus., Inc.,* 564 A.2d at 654.

45. *Id.* at 660.

46. *Id.* at 658.

47. *Id.* at 661.

48. *See, e.g., Williams v. Geier,* 671 A.2d 1368, 1376 (Del.1996); *Stroud v. Grace,* 606 A.2d 75, 95 (Del.1992) (holding *Blasius* inapplicable).

49. *Blasius Indus., Inc.,* 564 A.2d at 660.

50. *Id.*

51. 2000 WL 1805376, 2000 Del.Ch. LEXIS 170 (Dec. 4, 2000). In *Peerless* the board of directors made a proposal to increase by 1,000,000 the number of shares available for issuance through the company's existing option plan. This proposal was included in the proxy statement for the company's annual meeting. A large institutional stockholder, SWIB, opposed this proposal and wrote to the

are not present, the business judgment rule will ordinarily apply in recognition of the fact that directors must continue to manage the business and affairs of the corporation, even with respect to matters that they have placed before the stockholders for a vote.[52] This notion also recognizes the fact that in the context of a stockholder vote a board of directors must perform a myriad of ministerial functions in order to ensure an orderly voting process which all, in some way, indirectly affect the vote. For example, scheduling the meeting and record dates, deciding on a location for the meeting, choosing inspectors of elections, or retaining proxy solicitors are all decisions that directors are often called upon to make that could be seen as affecting the shareholder vote.

■ The fundamental concerns identified by Chancellor Allen will continue to guide the court in this context, and indeed will impel the court to undertake a careful inquiry, at the threshold, into whether the presumptions of the business judgment rule—"that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company"[53]—are present. Where the plaintiff fails to rebut the presumption that a majority of the board of directors was disinterested and acted in good faith and with due care, the court will ordinarily defer to the board's decisions involving the administration of the stockholder vote. Of course, proof that the challenged action was taken by a majority of outside, disinterested directors will "materially enhance" such presumptions.[54]

■ This is consistent with the recognition that once a board of directors deems a merger agreement favorable, it may employ various legal powers to achieve a favorable outcome on a shareholder vote

other stockholders urging them to vote against it. When the annual meeting was convened, the vote was running against this proposal, although the overall turnout on this issue was lower than on the other, noncontroversial issues before the meeting. Acting on his own, as chairman of the meeting, the CEO (who was presumably eligible for grants under the plan) closed the polls as to the other matters but left the polls open on the controversial proposal and adjourned the meeting for 30 days. While he later claimed to have discussed doing so with the other directors, the board as a whole did not consider the matter. The company did not publicize these actions and did not even inform SWIB until 12 days later. During the adjournment, the company continued to solicit votes in favor of the proposal as well as revocations of previously submitted votes against it. When the meeting was reconvened, the proposal passed by a slim margin.

Although *Peerless* does not involve issues touching on control, the court applied the *Blasius* standard because it perceived that the self-interested CEO's actions were taken to interfere with the stockholder vote, *which at the time was running against the proposal.* The Chancellor recognized that the corporation could have simply reproposed the matter at another meeting. Nevertheless, he viewed the totality of the actions taken in connection with the adjournment as evidencing an improper purpose. Thus, he cast on the defendants the burden of showing a compelling justification for their actions.

*Blasius* is not easily or readily applied outside the context of matters touching on directorial control, as its demanding standard could unduly limit the legitimate exercise of directorial power and discretion in other contexts. Nevertheless, in any voting context, actions taken for the purpose of interfering with a full and fair exercise of the stockholder franchise will run afoul of basic equitable limitations found in our law. *Schnell,* 285 A.2d 437.

52. Of course, there are other positive limitations placed on board conduct in this context. *See* text accompanying notes 55–59.

53. *Aronson v. Lewis,* 473 A.2d 805, 812 (Del. 1984).

54. *Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946, 955 (Del.1985).

required to approve that agreement. Directors can spend the corporation's money on printing and distributing a proxy statement explaining their judgment as to the benefits of the merger proposal. The can retain experts to solicit proxies and publicize their views. They can hire lawyers and other advisors to defend their actions in court or in front of administrative or legislative bodies.

While recognizing the board's power to take such action, equity necessarily limits what a board of directors can do in its attempt to achieve shareholder approval of such a transaction. As is well known, "inequitable action does not become permissible simply because it is legally possible."[55] Following this principle, the courts have held a board may not coerce the shareholder vote by, *inter alia,* agreeing to unduly high termination fees or other structural devices that force stockholders to vote in favor of a transaction for reasons not related to its merits.[56] A board of directors cannot mislead its stockholders[57] or engage in other fraudulent or inequitable practices.[58] Ordinarily, if a clear majority of stockholders has voiced disapproval of the transaction, the board may not take steps to "thwart [that] shareholder majority."[59]

Setting a new meeting and record date, by itself, does not fall within this category of prohibited acts. The board owes its fiduciary duties to the corporation and its stockholders, not merely to a set of

stockholders as of a certain record date. While actions such as coercing stockholders preclude a "full and fair opportunity to vote,"[60] setting a new meeting date and record date, by itself, does not do so. Instead, in the proper circumstances, doing so can provide for a vote that is, for lack of a better term, fuller and fairer, in that more stockholders having a direct interest in the outcome of the vote are likely to vote. This is especially true in this case where a clear majority of shareholders who have voted before the postponement expressed approval of the merger.[61]

D. *The Business Judgment Rule Is The Applicable Standard When Reviewing The Board's Decision To Change The Record Date*

In earlier proceedings, the plaintiffs sought to prove that Roth controlled the Board and its processes. The court found otherwise, stating that during negotiations with AXA, "the Board repeatedly demonstrated its independence and control."[62] The court further found based on the preliminary record that throughout the course of events, "the Board acted reasonably in determining its course of action."[63]

The court again finds, based on the preliminary factual record, that the Board discharged its fiduciary duties in determining its course of action following the issuance of the Opinion. Notably, the decision to postpone the meeting and set a new record date was taken in response to

---

**55.** *Schnell,* 285 A.2d at 439.

**56.** *Williams,* 671 A.2d at 1382–83.

**57.** *Newman v. Warren,* 684 A.2d 1239, 1246 (Del.Ch.1996).

**58.** *Schreiber v. Carney,* 447 A.2d 17, 24 (Del. Ch.1982).

**59.** *Blasius Indus., Inc.,* 564 A.2d at 660.

**60.** *Williams,* 671 A.2d at 1376.

**61.** *See* Ottensoser Aff. Ex. 11, at MONY 32787. The court notes here that not being in receipt of favorable votes from a majority of outstanding shares is quite different from not being in receipt of favorable votes from a majority of proxies in hand.

**62.** *In re The MONY Group Inc. S'holder Litig.,* 852 A.2d 9, 20.

**63.** *Id.* at 24.

this court's injunction and the amendments made to the merger agreement. At a minimum, the Board had to delay the meeting to allow for the preparation, filing and distribution of supplemental proxy materials.

The Board met on February 22, 2004 to discuss its alternatives. The record shows that at this meeting, the Board received reports and opinions from several different sources including senior management, independent legal counsel, independent financial advisors, and its proxy solicitor. The record shows the Board was inquisitive at this meeting, asking questions of all present.

The plaintiffs argue unconvincingly that Roth had control over the February 22 meeting and had predetermined its outcome. Roth did testify in deposition that he had decided sometime between the 18th and 20th of February to recommend to the Board that it change the record date.[64] Pursuant to that recommendation, Roth circulated a draft press release to the Board prior to the February 22 meeting announcing an April 8, 2004 record date.[65] But, as discussed in the Opinion, the Board has consistently acted in an independent manner. Indeed, the Board rejected AXA's initial bid and substantially lowered payouts to senior management under the CICs.[66] The plaintiffs have presented no evidence to indicate that the sophisticated and independent Board simply rubber-stamped Roth's recommendations. On the contrary, the record indicates that the Board considered what would happen should the deal be voted down, and openly discussed continuing MONY's business with new management.[67]

Viewed in its entirety, the record suggests no circumstances requiring application of the stringent *Blasius* standard in this nonelection context. The decision to change the record date was not a unilateral decision but was made in response to, among other things, this court's Opinion. It was made by a disinterested, independent Board upon the recommendation of its advisors. The decision of the outside directors was unanimous, while all three interested directors abstained.[68] And, importantly, the Board was not thwarting the will of the MONY stockholders, which at that time, *supported* the transaction.

Moreover, the judgment to set new meeting and record dates appears reasonable in the circumstances. Given the circumstances—the Opinion, the renegotiation of the merger agreement resulting in terms more favorable to shareholders, the downgrade in MONY's ratings and potential for future downgrade, the deterioration of MONY's financial performance, the turnover in MONY's shares and resulting staleness of the record date, the need to provide additional disclosure to MONY's stockholders, the fact that no other bidder had emerged—there was ample room for the Board to make a good faith and honest determination that approval of the merger, and a change in the record date in order to achieve that result, was in the best interests of the corporation.

E. *The* Unocal *Standard And The Change In The Record Date*

In *MM Companies, Inc. v. Liquid Audio, Inc.,* the Supreme Court recognized that there is a "substantial degree of con-

---

**64.** Ottensoser Aff. Ex. 3, at 206.

**65.** *Id.* Ex. 31 (memorandum from Roth to Board).

**66.** *In re The MONY Group Inc. S'holder Litig.,* 852 A.2d 9, at 26.

**67.** Theobald Aff. ¶ 10(b).

**68.** *Id.* ¶ 14; Ottensoser Aff. Ex. 33.

gruence between the rationale that led to the *Blasius* 'compelling justification' enhanced standard of judicial review and the logical extension of that rationale *within* the context of the *Unocal* enhanced standard of review." [69] *Unocal Corporation v. Mesa Petroleum Co.*, a case dealing with Board action in the face of a pending takeover bid, is based on the theory that in situations implicating control of the company, there is an "omnipresent specter that a board may be acting primarily in its own interests, rather than those of the corporation and its shareholders." [70] In *Unocal,* the court acknowledged the existence of this "omnipresent specter" in the control context. It is in this context that the *Unocal* standard has been applied.

In *Gilbert v. El Paso Co.*, the Supreme Court stated that "[t]he law is clear that *Unocal* is invoked as the result of any defensive measures taken in response to some threat to corporate policy and effectiveness *which touch upon issues of control.*" [71] Cases in which both *Blasius* and *Unocal* review are implicated involve measures by a board with the primary purpose to preclude or, at least, impede the effective exercise of the shareholder franchise *and* the board's control of the corporation is at play. [72] Here, if the merger is consummated, none of the directors will retain their positions with the surviving company. [73] Thus, the court concludes that the *Unocal* standard of review does not apply.

Nevertheless, even if the *Unocal* standard did apply, the Board's actions clearly meet that test. The *Unocal* standard, as interpreted by *Unitrin, Inc. v. American General Corporation,* [74] first requires the court to determine if a defensive measure is preclusive or coercive. If so, it will be deemed draconian, and not protected by the presumptions of the business judgment rule. If it is not draconian, the defensive measure must be within a range of reasonableness, or proportional to an identified threat.

The Board clearly identified a threat— the possibility that a merger that the Board twice reasonably deemed to be in the best interests of the Company and its stockholders, and which was supported by a majority of stockholders who had voted, would fail to win approval, in large part due to a stale record date. Its response, to change the record date, was not preclusive of a full and fair vote; if anything, it enfranchised those stockholders who were equity owners of the corporation but who could not vote. Finally, the Board's response was taken on the advice of its proxy solicitor, and is certainly proportionate and within a range of reasonableness.

## F. *The Decision To Use The Old Proxies*

MONY discloses at various places in its preliminary revised proxy statement the following statement of intent:

> interfere with or impede the effective exercise of the shareholder franchise *in a contested election for directors.*") (emphasis added); *Stroud,* 606 A.2d at 92 n. 3 ("Board action interfering with the exercise of the franchise often arose during a hostile contest for control where an acquiror launched both a proxy fight and a tender offer. Such action necessarily invoked both *Unocal* and *Blasius.*").

69. *Liquid Audio, Inc.,* 813 A.2d at 1129.

70. 493 A.2d at 954.

71. 575 A.2d 1131, 1144 (Del.1990) (emphasis added).

72. *See, e.g., Liquid Audio, Inc.,* 813 A.2d at 1131 ("The compelling justification standard of *Blasius* also had to be applied *within* an application of the *Unocal* standard to that specific defensive measure because the primary purpose of the Board's action was to

73. Defs.' Answering Br. at 24.

74. 651 A.2d 1361, 1387–88 (Del.1995).

If you previously submitted a proxy for the special meeting of stockholders originally scheduled for February 24, 2004, which proxy has not subsequently been revoked, and are a holder of record on April 8, 2004, MONY intends to vote those proxies at the rescheduled special meeting of stockholders on May 18, 2004. However, we urge you to complete, sign, date and promptly mail your enclosed proxy card or cast your vote in person or by delivering your proxy via telephone or via the Internet as described in this proxy statement.[75]

The proxy statement does not disclose how MONY formulated this intent or who, if anyone, made the decision to rely on the "old" proxies. Nevertheless, it is hardly surprising that MONY plans to rely on those "old" cards since a great deal of time, effort, and money was spent in soliciting them from MONY stockholders. Moreover, while the Opinion concluded that supplemental disclosures were required, it did not hold that an entirely new solicitation was necessary. In fact, given the limited nature of the injunction contemplated by the Opinion, there is no reason to believe that the court would have required an entirely new solicitation, as is evident from the fact that the Opinion itself contemplated the need for only a short adjournment of the February 24 meeting.[76]

The plaintiffs cite a number of reasons why MONY's plan to use "old" proxy cards is either legally invalid or an inequitable manipulation of the voting process during a proxy fight. These claims were presented for the first time in briefs filed in conjunction with the motion for preliminary injunction because the plaintiffs apparently did not anticipate the issue and, so, became aware of MONY's intention only after MONY filed its revised proxy materials with the SEC, which was after the completion of discovery in this matter.

Notwithstanding the lack of a factual record about the decision-making process behind this expression of intent, all parties have urged the court to render a decision about the continuing validity of the "old" proxies and the propriety of their use at the postponed meeting.[77] The purpose of doing so is to clear the air and to avoid the possibility of a post-election review of proxies on the basis of these claims. The court concludes that it is able, at this time, to pass on the questions of legal validity and it will do so on a summary judgment basis as the factual record in that regard is clear and undisputed. That discussion follows. The court cannot, however, make any determination at this time about the equitable claims advanced by the plaintiffs, since the factual record is a blank slate. For example, it is unclear how the decision was made to rely on "old" proxies, who made it, what factors were considered, whether it was thought to disadvantage the opponents of the merger proposal, etc. In short, there is no record from which the court could determine whether this decision is of the type normally and routinely undertaken during the course of a proxy solicitation, in which case a conclusion that the "old" proxies continue to be valid might end the inquiry. Similarly, there is no record on which the court could rely in concluding that the decision-making pro-

---

**75.** Ottensoser Aff. Ex. 2, at ii, iv, 5, 16, 20.

**76.** *See In re The MONY Group S'holder Litig.*, 852 A.2d 9, 32–33 (stating that "the necessary supplemental disclosure can be accomplished quickly . . .").

**77.** Alternatively, the issue would be properly decided in an action under section 225(b) of the General Corporation Law. *See* 8 *Del. C.* § 225(b) ("Upon application of any stockholder . . . the Court of Chancery may hear and determine the result of any vote of stockholders . . . upon matters other than the election of directors. . . .").

cess was flawed or that the decision was taken in order to improperly or unfairly advantage persons interested in securing the approval of the merger.[78]

 The arguments over legal validity turn on whether the form of proxy used by MONY continues to confer power on the named proxy holders at the new meeting and with respect to shares owned on the new record date. At the outset, it has been noted that "the integrity of the entire proxy voting procedure necessarily and implicitly rests upon the premise that the agency relationship is genuine and, correlatively, that the proxy instrument accurately and reliably evidences that relationship." [79] Thus, the court must look at the language of the proxy card to determine the nature and extent of the agency relationship it created.[80] The old proxy card's language authorizes the proxies to "vote all shares of MONY common stock owned on the record date by the [shareholder] at the Special Meeting of Stockholders to be held at the New York Marriot Marquis hotel ... on Tuesday, February 24, 2004, or any adjournment or postponement thereof, upon such business as may properly come before the meeting; including the items on the reverse side of this form, as set forth in the Notice of Special Meeting of Stockholders and Proxy Statement." The items discussed on the reverse side of the proxy are:

● The adoption of the Agreement and Plan of Merger, dated as of September 17, 2003, among AXA Financial, Inc., AIMA Acquisition Co. and The MONY Group Inc., providing for the merger of a wholly owned subsidiary of AXA Financial with and into MONY.

● The approval of any proposal to postpone or adjourn the special meeting to a later date to solicit additional proxies in favor of [the above Proposal] in the event there are not sufficient votes for approval of Proposal 1 at the special meeting.

The plaintiffs argue that the proxy card is no longer valid because the agency relationship was limited to voting shares "owned on the record date" at the time he card was signed, i.e., the old record date. The language of the proxy card, however, is not limited to January 2, 2004, the old record date. Instead, it is more general in nature and can be seen to extend to any record date for the special meeting. Thus, the proxy card continues to authorize the holder thereof to vote to the extent to which a person signing the card continues to own stock on the new record date.[81]

78. The record does show, as MONY's counsel candidly admitted at the hearing, that the decision to use the "old" proxies was not made by MONY's independent directors. Thus, the persons on whose judgment the court might rely were never in a position to make a judgment about the fairness of this proposed action. While the court does not suggest that the board of directors was required to make this decision, the court will necessarily take a more jaundiced view of the facts if it is Roth, or another interested person, who ultimately controls the conduct of the proxy fight in this regard and it causes an unfair disadvantage to those who are opposed to the merger proposal.

79. *Parshalle v. Roy*, 567 A.2d 19, 27 (Del.Ch. 1989).

80. *N. Fork Bancorp, Inc. v. Toal*, 825 A.2d 860, 867–68 (Del.Ch.2000).

81. Plaintiffs make a similar argument based on the General Corporation Law. Section 213(a) of that law requires that the "record date shall not precede the date upon which the resolution fixing the record date is adopted by the board of directors." 8 *Del. C.* § 213(a). Plaintiffs argue that because MONY approved the April 8 record date on February 22, but is using proxies sent in based on the old January 2 record date, use of such proxies would violate this statutory requirement. Again, the plaintiffs' argument misses the point. Only those proxies sent in by stockholders *still of record* based on the new record date will be used by MONY. As such, there is no statutory violation.

The plaintiffs also argue that the revised merger agreement is not the agreement referred to on the reverse side of the proxy card. This is a hypertechnical reading of the language of the proxy card. Surely, to any common understanding, the slightly amended merger agreement, whose terms are in all respects more favorable to the stockholders than the original merger agreement, is the same agreement referred to on that card. The omission of the phrase "as it might be favorably amended" does not deprive the agent of power to vote.

The plaintiffs further argue that the proxies only extend to the February 24 meeting, or any adjournment or postponement thereof, and that the May 18 meeting is a *new*, not *postponed* meeting. Although documents in the record prepared by MONY or its agents occasionally refer to the May 18 meeting as a new meeting, it is clear the term is used to refer to a meeting scheduled after the postponement of the February 24 meeting. Indeed, MONY's announcement that the February 24 meeting would not take place states, "MONY ANNOUNCES IT WILL POSTPONE ITS STOCKHOLDER MEETING IN RESPONSE TO A DELAWARE CHANCERY COURT ORDER."[82] Moreover, "postpone" is defined as "to put off to a later time."[83] The facts clearly indicate that this is exactly what happened here. The May 18 meeting is simply a postponement of the February 24 meeting.

The plaintiff's final "technical" argument is that the old proxies were obtained based on disclosures the Opinion found misleading. Although this does not limit the agency authority granted by the old proxies, it does highlight a concern that those who submitted proxies be made aware of the additional disclosures. The preliminary revised proxy statement contains the additional disclosures, but presents them in a way that does not highlight them or their existence. To comply with the Opinion, the revised proxy materials should include a statement clearly visible to stockholders directing their attention to the supplemental disclosures made in response to the Opinion. The court assumes this will be done without the need for a formal order.

## V.

The plaintiffs argue that the amended proxy materials are materially misleading and incomplete in that they fail to disclose MONY's *real* reason for setting new meeting and record dates.[84] The court discusses each disclosure claim separately and finds that none of them has a reasonable probability of success on the merits. The plaintiffs claim that the reasons given by the Board for changing the record date are pretextual, materially misleading and/or incomplete. Delaware law is well-settled that directors have a fiduciary duty to make full and fair disclosure of all material information within the board's control when seeking stockholder action.[85] "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote,"[86] Directors, however, do not have an affirmative duty to state "the grounds of their judgment for or against a proposed shareholder action."[87]

**82.** Ottensoser Aff. Ex. 29.

**83.** Webster's Ninth New Collegiate Dictionary 920 (1988).

**84.** Pls.' Opening Br. at 33.

**85.** *Stroud,* 606 A.2d at 84.

**86.** *Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 944 (Del.1985) (adopting the United States Supreme Court's definition of materiality as stated in *TSC Indus. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

**87.** *Newman,* 684 A.2d at 1246.

Directors may, of course, choose to state their reasons for recommending a certain action and that statement must be true and not misleading.[88] Therefore, disclosures relating to the Board's subjective motivation or opinions are not *per se* material, as long as the Board fully and accurately discloses the facts material to the transaction.

## A. *Primary Reason For Changing The Record Date*

The plaintiffs first argue that the proxy materials fail to disclose that the Board's primary reason for changing the record date "was to enable them to gerrymander the vote by enabling a large number of ORAN holders and arbitrageurs to vote on the Merger."[89] The factual record does not support this allegation.[90] As already discussed, the Board met on February 22 to discuss the circumstances affecting the merger. The record shows, as disclosed in the amended proxy materials, that at this meeting, the Board considered numerous factors in deciding whether to keep the original record date with a short adjournment of the special meeting or to set a new record date and postpone the meeting.[91] Notably, the amended proxy materials clearly state that the status of the vote on the merger was addressed at the Board meeting and was cited as one of the reasons the Board considered in making its decision to reset the record and meeting dates.

Further, as a general rule, proxy materials are not required to state "opinions or possibilities, legal theories or plaintiff's characterization of the facts."[92] Moreover, the disclosure requested by the plaintiffs would be a form of "self-flagellation" that this court has rejected on numerous occasions.[93]

88. *Id. See Arnold v. Soc'y for Savings Bankcorp.*, 650 A.2d 1270, 1280 (Del.1994) (holding that even though Delaware law "as an abstraction, does not require disclosure of inherently unreliable or speculative information," once the "defendants traveled down the road of partial disclosure of the history leading up to the Merger ..., they had an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events").

89. Pls.' Opening Br. at 35.

90. Notably, the plaintiffs did not depose any of the outside directors in connection with their claim of the Board's "primary motivation."

91. The amended proxy materials cite the following factors considered by the Board in making its decision:
- the merger agreement had been amended in certain significant respects;
- the high trading volume in MONY stock gave rise to a significant risk that the merger would not be approved by a majority of the outstanding shares because a significant portion of the trading represented sales without proxies;
- setting a new record date would allow all supporters and opponents of the merger, including the ORAN holders, a fair opportunity to purchase additional MONY shares to vote at the special meeting;
- the potential disenfranchisement of current and future MONY stockholders if the original record date was maintained due to the amount of time that it would take to prepare the new proxy statement, clear the SEC and provide sufficient time for stockholders to consider the new proxy materials, in light of the heavy trading volume in MONY shares;
- the large number of odd-lot stockholders with whom more time is necessary to communicate; and
- the re-scheduling of the record date closer to the meeting would entitle stockholders affected by the consummation of the merger to vote.
Ottensoser Aff. Ex. 2.

92. *Seibert v. Harper & Row, Publishers, Inc.*, 1984 WL 21874, at *6 (Del.Ch. Dec.5, 1984).

93. "We recognize the long-standing principle that to comport with its fiduciary duty to disclose all relevant material facts, a board is not required to engage in 'self-flagellation' and draw legal conclusions implicating itself in a breach of fiduciary duty from surround-

**B.** *Disclosure Of Divergent Interests In The Merger*

■ The plaintiffs next argue that the Board failed to disclose that the ORAN holders had divergent interests from the MONY stockholders with respect to the merger. The plaintiffs argue that the primary interest of the ORAN holders is to ensure that the merger is approved because the ORANs are convertible to AXA stock if the merger is consummated, thus enabling investors who are long in the ORANs to obtain a substantial profit based upon the difference in the price paid for the ORANs and the closing price of AXA's common stock. The plaintiffs argue that the Board had the duty to disclose that the ORAN holders' financial interests differed from the interests of the MONY stockholders.

■ Stockholders of Delaware corporations have the right to vote their shares in their own interest.[94] The personal interests of the ORAN holders and the MONY stockholders are irrelevant. Moreover, the potential return to investors who are long in the ORANs if the merger is approved is a fact that was readily available to the stockholders and therefore did not merit separate disclosure in the amended proxy materials. Proxy statements need not disclose "facts known or reasonably available to the stockholders."[95] As noted in the plaintiffs' brief, news articles were published in mid-February that described the nature of the ORANs, the interests of the ORAN holders in the merger, and how ORAN holders and arbitrageurs were purchasing large amounts of MONY stock in order to influence the outcome of the merger.[96] More notably, Highfields, the owner of approximately 4.6% of MONY shares, described the ORAN holders' purchase of MONY stock in its February 19th letter to the court, which was filed publicly.[97] Highfields also notes the interest of the ORAN holders on its website encouraging MONY stockholders to seek appraisal.[98] Therefore, information relating to the possible divergent interests of the ORAN holders from the MONY stockholders was both available publicly and communicated to the MONY stockholders.

---

ing facts and circumstances prior to a formal adjudication of the matter." *Stroud,* 606 A.2d at 84 n. 1.

**94.** *See Bershad v. Curtiss–Wright Corp.,* 535 A.2d 840, 845 (Del.1987) (discussing how a stockholder's right to vote shares in its personal interest is limited only by any fiduciary duty owed to other stockholders).

**95.** *Seibert,* 1984 WL 21874, at *6.

**96.** Pls.' Opening Br. at 11–13, 15. *See* Ottensoser Aff. Ex. 17 (Dow Jones Newswire column titled "Unusual Arb Play at Work in AXA/MONY Merger"); *id.* Ex. 19 (Dow Jones News article titled "AXA Gets MONY Managers to Sweeten Its Bid"); *id.* Ex. 20 (several media clips titled "MONY/AXA Financial Media").

**97.** "Allowing MONY's management to change the record date inequitably permits manage-

ment to place the fate of MONY in the hands of AXA bondholders—*persons who do not have the same interests in MONY as the other MONY shareholders* and, indeed, have little regard for the value of MONY." Bracegirdle Aff. Ex. 6 (Letter from counsel of Highfields to Vice Chancellor Lamb, Feb. 20, 2004 (emphasis added)). Highfields also filed a letter to the SEC indicating that any attempt to delay the special meeting would cause MONY irreparable harm and should be viewed as suspect. *See* Bracegirdle Aff. Ex. 5 (Dow Jones Newswires article titled "Highfields Filing Urges MONY to Amend Proxy Quickly"); Harkins Aff. ¶ 17.

**98.** "Though MONY points to a court ruling and minor amendments to the agreement as triggering such delay, their proxy statement acknowledges that such a delay allows '*investors [who have an interest in AXA convertible bonds] ... to purchase additional shares of MONY stock to vote at the special meeting.*'" *www.demandfairvalue.com.* (Apr. 8, 2004).

## C. Disclosure Of High Trading Volume And Its Effect On The Vote

The plaintiffs argue that the Board's statement in the amended proxy materials that it considered "the fact that many current MONY stockholders would not be able to vote on the merger due to the extraordinary volume of trading of MONY common stock since the original January 2, 2004 record date" is misleading because it does not distinguish the five-day period in February when trading was unusually high. This claim also lacks support in the record.

The record clearly shows that the Board was advised by Harkins that a significant percentage of MONY shares had traded since the original record date and that almost all of the trading would have been without proxies.[99] The record shows that the trading volume increased significantly after January 2; specifically, Harkins stated that the trading in January was more than three times the average daily trading volume in December 2003 and almost double the average daily trading volume during the three-month period ending December 31, 2003.[100] The fact that there was *extraordinary* trading after the Opinion does not minimize the significant increase in trading as of January, nor does it detract from the Board's general concern that the increased trading volume could substantially lower the investor participation in the vote at the special meeting.

Moreover, the trading activity of MONY shares is publicly available information and does not warrant special disclosure. The amended proxy materials accurately describe the Board's concern with the high trading activity and its effect on the record date. The Board disclosed its concern

that "there was a potential for further disenfranchisement of current and future MONY stockholders" because of the heavy trading volume and that "there was a significant risk that the merger would not be approved by a majority of all the outstanding shares based on the assumption that a significant portion of this trading represented sales without proxies."[101]

The plaintiffs further claim that the Board expressed no concern about the January 2 record date stockholders being disenfranchised until February 18, 2004 and argues that this was "a thinly veiled attempt to rig the vote."[102] The record clearly shows that Harkins advised MONY of the possible disenfranchisement of the January 2 record holders in January and again in February, and that both he and the Board hoped that the trading activity would decline.[103] The Board's decision to act in February after approximately 15 million shares were traded in the span of five days does not *ipso facto* lead to the conclusion that the Board's disclosure was misleading. There are simply no facts presented to support this contention.

## D. Disclosure Of Potential Future Disenfranchisement

The amended proxy statement discloses that one of the factors that the Board considered when making its decision to change the record date was the potential for further disenfranchisement of MONY stockholders if the meeting date was delayed and the record date maintained. The Board cited the following three reasons for its concern: (i) the Opinion required additional disclosure, (ii) such disclosure would take time to prepare and file with the SEC, and (iii) the heavy trading

---

99. *See* Theobald Aff. ¶ 6; Harkins Aff. ¶¶ 11–16, 18; Ottensoser Aff. Ex. 2.

100. Harkins Aff. ¶ 11.

101. Ottensoser Aff. Ex. 2.

102. Pls.' Opening Br. at 39.

103. Harkins Aff. ¶¶ 12, 13.

volume of MONY shares and the expectation that it would continue.

■ The plaintiffs argue that this statement is misleading because additional disclosure required by the court could have been accomplished quickly and did not require a delay of the meeting. The plaintiffs also argue that the Board did not disclose a basis for the expectation that the heavy trading would continue and that in fact the heavy trading volume did not continue after the Board announced the new record date.

This claim also lacks support in the record. At the hearing on April 6, 2004, counsel for MONY stated that the additional disclosure material filed with the SEC on March 11 had been approved only that very morning by the SEC. This suggests that it was reasonable for the Board to allow time for SEC clearance. Moreover, the Board was advised that there was insufficient time to prepare appropriate disclosures and clear the SEC if it simply adjourned the special meeting.[104] Harkins also advised the Board of the substantial turnover in MONY shares since January 2 and the negative effect that this might have on the success of the merger.[105]

Furthermore, the Board had no way of knowing at its February 22 meeting when the heightened trading activity would end. It is unreasonable for the plaintiffs to now argue that the Board's disclosure was misleading because a contemplated event did not actually happen. At the time of the Board meeting, the volume of trading was high and the Board could not have predicted that the average daily trading volume would return to normal levels after February 23.

### E. Disclosure Of Necessary Solicitation Period For Odd–Lot Stockholders

■ The plaintiffs claim that it is misleading for the Board to state that one of the factors considered in delaying the meeting date is the amount of time necessary to communicate with odd-lot stockholders. The plaintiffs do not contest that approximately 18% of MONY's outstanding shares are held by stockholders who own less than 100 shares each, nor do they disagree with the proxy solicitor's recommendation that this stockholder profile creates the need for a longer-than-normal proxy solicitation period in order to effectively communicate with such stockholders. Since MONY is providing the proxy solicitor with roughly the same amount of time prior to the May 18 meeting to communicate the new disclosure material to the odd-lot stockholders that it had with the initial proxy materials and the original meeting date, the court fails to see how this is misleading in any respect. The Board has taken the proxy solicitor's advice regarding the amount of time necessary to communicate effectively with this pool of shareholders in setting both the original meeting date and the new meeting dates. There is nothing misleading in the fact that the Board, upon advice from its proxy solicitor, was aware of and concerned with guaranteeing a fully informed stockholder vote.

### F. Disclosure Of Option To Adjourn Special Meeting

■ Lastly, the plaintiffs claim that the Board failed to disclose that a majority of the proxy cards in hand approved proposal 2 of the initial proxy and therefore the Board "unilaterally thwarted the shareholders' expressed will in connection with the adjournment of the special meeting."[106] The plaintiffs argue that the

---

**104.** *See* Defs.' Answering Br. at 44; Harkins Aff. ¶ 24; Theobald Aff. ¶ 8.

**105.** Harkins Aff. ¶ 24; Theobald Aff. ¶ 8.

**106.** Pls.' Opening Br. at 41. Proposal 2 reads: "The approval of any proposal *to postpone or adjourn* the special meeting to a later

amended proxy materials are "completely silent" as to this shareholder approval, and that this shareholder approval is an expression of "the unequivocal preference for maintaining the record date, and adjourning the special meeting, as opposed to the wholesale revision of the voting process." [107]

This claim obviously overstates the legal or equitable significance of the interim tally of proxy cards at the time of the February 22 meeting. Moreover, the amended proxy materials clearly disclose that the Board discussed two alternatives at its February 22 meeting: (i) allow the vote to proceed without setting a new record date and with only a short adjournment; and (ii) set new record date and postpone the meeting to allow for more ample time to solicit votes. The Board chose the second option after considering several factors. Therefore, the amended proxy materials fully disclose that the adjournment of the

special meeting was an option that the Board considered but in its business judgment decided not to pursue.

## VI.

For the foregoing reasons, the plaintiffs have not established a reasonable likelihood of success on the merits of any of their claims. To the limited extent described in Section IV.F, summary judgment will be entered in favor of the defendants. The plaintiffs' motion for preliminary injunction is therefore DENIED. MONY shall, however, ensure the revised proxy statement complies with Section IV.F of this opinion. Counsel for MONY is directed to submit a form of order on notice by Tuesday, April 13, 2004.

---

date in the event there are not sufficient proxies at the special meeting to approve Proposal 1." Ottensoser Aff. Ex. 40 (emphasis added).

107. Pls.' Opening Br. at 41.