**ESOPUS CREEK VALUE LP, Black Horse Capital, LP, Black Horse Capital (QP) LP and Black Horse Capital Offshore Ltd., Plaintiffs,**

v.

**Mark S. HAUF, John Chalsty, Alan K. Greene, Leonard White, Clark A. Johnson, David Gale Wayne Henderson, Stuart Subotnick, I. Martin Pompadur, Harold F. Pyle, III, Bryce D. Elledge, Natalia Alexeeva and Metromedia International Group, Inc., a Delaware corporation, Defendants.**

**C.A. No. 2487–N.**

Court of Chancery of Delaware, New Castle County.

Submitted: Nov. 28, 2006.
Decided: Nov. 29, 2006.

Elizabeth M. McGeever, Bruce E. Jameson, Paul A. Fioravanti, Jr., Laina M. Herbert, Prickett Jones & Elliott, P.A., Wilmington, DE; Marc R. Rosen, Kleinberg, Kaplan, Wolff & Cohen, P.C., New York City, for the Plaintiffs.

Daniel A. Dreisbach, Steven J. Fineman, Geoffrey G. Grivner, Daniel M. Silver, Richards, Layton & Finger, P.A., Wilmington, DE, for Defendant Metromedia International Group, Inc.

Todd C. Schiltz, Wolf, Block, Schoor and Solis–Cohen, LLP, Wilmington, DE, for Defendants Mark S. Hauf, John Chalsty, Alan K. Greene, Leonard White, Clark A. Johnson, David Gale, Wayne Henderson, Stuart Subotnick, I. Martin Pompadur, Harold F. Pyle, III, Bryce D. Elledge, Natalia Alexeeva.

Martin Flumenbaum, Daniel J. Leffell, Paul, Weiss, Rifkind, Wharton & Garrison, LLP, New York City, for all Defendants.

## *OPINION*

LAMB, Vice Chancellor.

In *Newcastle Partners, L.P. v. Vesta Insurance Group, Inc.*[1] this court considered whether there was any substantial conflict between its power, acting pursuant to 8 *Del. C.* § 211(c), to order a Delaware corporation to convene an annual meeting for the purpose of electing directors, and federal proxy regulations that, in normal circumstances, prohibit registered companies from convening such a meeting without first disseminating both an annual report and either a proxy statement or an information statement. After exploring the history of section 14(c) of the Securities Exchange Act of 1934,[2] the court concluded that the right of stockholders to meet for the purpose of choosing directors should not be suspended indefinitely merely because the corporation is unable to file current financial reports or to comply with federal proxy regulations.

The court now finds it necessary to consider a related issue in the case of a Delaware corporation that is considering an asset sale that, as a matter of Delaware law and the company's certificate of incorporation, requires the affirmative vote of a majority of the common stockholders. The corporation is a registrant under the 1934 Act but has been unable to file an annual report on Form 10–K for several years. Despite this temporary embarrassment, the corporation is neither insolvent nor is it in any financial difficulty. Nevertheless, it has been advised that, due to its delinquent filing status, it is prohibited by federal regulation from calling a meeting of stockholders for the purpose of voting on the proposed transaction. To circumvent this apparent dead end, the board of directors adopted a plan to file a bankruptcy petition once the asset sale agreement is signed, and thereafter seek approval of the sale from the bankruptcy court, without a meeting and without a vote by the common stockholders.[3]

Thus, the question presented is whether a corporation's delinquency in its federal periodic reporting obligations should necessarily deprive that corporation's common stockholders of the power to authorize a sale of substantially all of the corporation's assets. This question was, the court believes, effectively answered in *Newcastle Partners.* For many of the same reasons discussed in that opinion, it is unlikely that the federal securities regulations would be interpreted or administered by the SEC as to prevent this court from requiring that the proposal to sell substantially all the assets of the corporation be put to a stock-

---

**1.** 887 A.2d 975 (Del.Ch.2005), *aff'd,* 906 A.2d 807 (Del.2005) (TABLE).

**2.** 15 U.S.C.A. § 78n(c).

**3.** The plan proposed further disadvantages the common stockholders because, in the bankruptcy proceeding, as proposed, the consent of two-thirds of the corporation's pre-

ferred stockholders is required in connection with the sale; whereas, outside of bankruptcy, the preferred stockholders have no vote on the transaction. The record reflects that the preferred stockholders have used this added leverage to negotiate advantageous terms for themselves in the proposed bankruptcy proceeding.

holder vote in accordance with Delaware law. Indeed, such an outcome would "cut directly against the policy of a strong stockholder franchise that underlies the SEC's rules on the distribution of proxy and information statements." [4]

For these reasons, the court will enter an order prohibiting the corporation and its directors from making any agreement to sell all or substantially all of the assets that is not conditioned upon the approval of the corporation's common stockholders. The order the court now enters includes provisions that require the corporation to fully comply with Delaware law in the giving of notice and distribution of basic information required for an informed vote.[5]

As a necessary step to secure a full and effective vote of the common stockholders, the court anticipates that the corporation will promptly seek exemptive relief from the SEC to permit it to engage in at least the limited range of activities prescribed in this order. Beyond that which the order (and Delaware law) requires, it is possible that the SEC will permit the corporation's management enough latitude to communicate effectively with stockholders. This would both further the interests of the stockholders and allow a balanced presentation of views on this most important issue.

If, however, the meeting cannot be held in accordance with the terms of the order, it is possible that some additional form of relief will be necessary to prevent further injury to the corporation or its stockholders flowing from the corporation's current inability to meet its periodic filing obligations under the federal securities laws.[6]

## I

### A. *The Parties*

The plaintiffs are Esopus Creek Value LP and Black Horse Capital, LP, two investment vehicles that own a substantial amount of the common stock of Metromedia International Group, Inc. Esopus and Black Horse beneficially own, respectively, 2.7% and 5.5% of Metromedia's outstanding common stock.

Defendant Metromedia International Group, Inc. is a Delaware corporation whose principal place of business is located in Charlotte, North Carolina. Metromedia's preferred and common stock are publicly traded over-the-counter on the "pink sheets." The company, through its 100% stake in Metromedia International Telecommunications, Inc., owns interests in communications and media outlets operating throughout Eastern Europe. Metromedia's principal asset, the disposition of which is currently at issue, is a 50.1% equity interest in Magticom, the Republic of Georgia's leading mobile telephony provider.

The individual defendants are the current members of Metromedia's board of directors, along with several of the company's executives. Defendant Mark Hauf is chairman of the board, president, and chief executive officer of the company. Hauf

---

4. *Newcastle Partners*, 887 A.2d at 980.

5. At the November 22, 2006 hearing on the motion for a preliminary injunction, counsel for the defendants agreed to the entry of such an order. In return, the court agreed to defer consideration of other issues raised by the motion, in particular a challenge to the legality of an agreement reached between the corporation and holders of the preferred stock.

As a consequence of this unusual development, the order the court now enters reflects the agreement of the parties to the order's form.

6. *See, e.g.,* 8 *Del. C.* § 322 ("Failure of Corporation to Obey Order of Court; Appointment of Receiver").

has held these positions since 2003. Hauf owns no Metromedia stock.

Defendant Stuart Subotnick is Metromedia's former chief executive officer and president, positions he held from 1996 to 2001. A Metromedia director since 1995, Subotnick maintains close business ties with John Kluge, Metromedia's founder. Subotnick's interests in Metromedia are sizable, with his beneficial ownership amounting to roughly 18% of the company's outstanding common stock and 4.9% of its preferred stock.

Defendants Wayne Henderson and David Gale became members of the board in 2004. Henderson and Gale are the appointees of the preferred stockholders, a constituency that currently enjoys the contractual right, until such time as the company becomes current in its dividend payments, to place two persons on the board pursuant to the restated certificate of incorporation. While Henderson owns no Metromedia stock, Gale's business, Delta Dividend Group, owns a small amount of the company's preferred shares.[7]

Defendant I. Martin Pompadur became a director of Metromedia in 1999. Pompadur is a senior officer of News Corporation, an entity that owns roughly 9.7% of the Metromedia's common stock.

Defendants John Chalsty, Alan Greene, Clark Johnson, and Leonard White are all independent directors of the company. None of these defendants own any significant amount of Metromedia common stock.

Defendants Harold Pyle, III, Natalia Alexeeva, and Bryce Elledge are senior officers of Metromedia. Pyle is the chief financial officer and treasurer. Alexeeva is Metromedia's general counsel and secretary. Elledge serves as the company's vice president of finance and chief accounting officer.

## B. The Facts [8]

Metromedia's financial situation has steadily improved since Hauf took the reins of the company in February 2003. Faced at that time with a severe liquidity crisis, Hauf undertook a plan to sell several of Metromedia's subsidiaries in order to generate sufficient cash flow to meet debt and operational obligations.

Hauf's strategy proved successful. Following its August 2005 $212 million sale of ZAO PeterStar, a fixed-line telephone provider based in St. Petersburg, Russia, Metromedia has operated free of any substantial long-term or secured debt. Additionally, Magticom's resurgent performance in the past three years has generated sizable free cash flow and EBITDA. Metromedia's common stock, which traded at 3 cents per share in February 2003, has experienced a more than fifty-fold increase in value since Hauf became CEO.

Hauf has not been equally successful in managing Metromedia's periodic reporting obligations during this same time frame. In March 2005, the company announced a delay in its Form 10–K filing for the 2004 fiscal year. Since that time, Metromedia has not filed either a Form 10–K or a Form 10–Q and remains wholly delinquent in its reporting obligations to the SEC. Further, the company's directors have not faced an election in over three years, since Metromedia has not convened any meeting for that purpose.[9] The defendants blame

---

7. Delta Dividend Group owns 21,000 shares of preferred stock, or roughly 0.5% of those shares outstanding.

8. These are the relevant facts as the court finds them for purposes of this opinion.

9. On August 18, 2006, Esopus filed an action under 8 *Del. C.* § 211 to compel Metromedia

the company's reporting shortfalls on Metromedia's auditor, KPMG Limited, for its repeated failure to sign off on audited financial statements, although they offer no documentary evidence regarding KPMG's reasons for failing to verify the company's financial results.[10]

This combination of burgeoning financial results and delinquent reporting provides the strange factual backdrop for what transpired next. In early to mid 2006, a group of investors approached Hauf proposing a sale of Magticom. According to the defendants, the consideration offered for Metromedia's 50.1% interest in Magticom far exceeded that of any previous unsolicited offer and represented an objectively fair valuation of the asset. Given the political and economic risks of conducting business in the Republic of Georgia, among other things, the board of directors authorized Hauf to negotiate with the buying group.

The fact that the sale of Magticom would constitute a "sale of all or substantially all" of Metromedia's assets posed a conundrum for the board. The directors were aware that 8 *Del. C.* § 271(a) required a vote of the common stockholders to approve the transaction. However, relying upon the advice of counsel, the directors believed that a section 271 vote was impossible. Since Metromedia's shares are registered under section 12 of the 1934 Act but the company was not current in its filings, the directors were told that section 14(c) of the 1934 Act barred the company from calling a meeting or soliciting proxies from the stockholders. Thus, compliance with state law voting requirements was not, in the board's view, a viable option.[11] Notably, the board did not consider requesting an exemption from the strictures of section 14(c) from the SEC, and no serious effort to secure such relief

---

to hold an annual meeting of stockholders. *Esopus Creek Value LP v. Metromedia Int'l Group, Inc.*, C.A. No. 2358-N, 2006 WL 2726166 (Del.Ch.). On September 26, 2006, the parties executed, and the court entered, a stipulation and order that required Metromedia to hold a meeting for the purpose of electing directors on December 15, 2006. The order provides that all nine Metromedia directorships would be subject to election and that those shares present and voting at the meeting will constitute a valid quorum to conduct business. On October 5, 2006, Esopus nominated five candidates for the upcoming election. The defendants have repeatedly told the court that the December 15 annual meeting will proceed as ordered.

10. According to deposition testimony, KPMG has repeatedly shifted its stance regarding whether former subsidiaries of Metromedia should be treated on a consolidated or unconsolidated basis. The KPMG partner in charge of Metromedia's audit has changed during the last three years. KPMG has shifted responsibility for the audit between its New York, Moscow, London, and Charlotte, NC offices. According to the defendants, these changes

have resulted in inconsistent positions and inconsistent interpretations by KPMG's staff. The net effect of the reporting problems, at least as it pertains to Metromedia stockholders' financial interests, may be quite marginal. As Subotnick stated in his deposition:

> [N]obody is challenging numbers, per se, they're trying to determine what gets reported as an equity line as opposed to consolidating results. My understanding is that when you finally get down to what it might mean over [the period of time the financials have not been filed] in dollars, in shifting dollars ... we're talking about something that might amount to maybe $2 million, maybe 2 cents, as it relates to the stockholders of Metromedia.

Subotnick Dep. 23–24, Nov. 10, 2006.

11. The board maintained this view despite the fact that, following a defection by William Harley, III (the chief investment officer of Mellon HBV Alternative Strategies LLC and a person with the discretionary power to vote 8.4% of Metromedia's common stock) from the plaintiffs' 13D filing group, the proposed sale had the professed support of roughly 44% of Metromedia's outstanding common equity.

was ever attempted.[12]

Relying on the premise that the federal securities laws barred it from calling a meeting or soliciting proxies, and thus prevented a vote of the common stockholders under 8 *Del. C.* § 271(a), the board determined to employ certain procedures under the federal bankruptcy code as a means to effectuate the transaction. The plan the board adopted contemplates a series of steps, as follows: first, executing an agreement providing for the sale of Magticom to the buying group; second, filing a voluntary bankruptcy petition under 11 U.S.C. § 301; third, petitioning the bankruptcy court to approve the Magticom sale under 11 U.S.C. § 363; and, finally, asking the bankruptcy court's approval of its plan of reorganization under 11 U.S.C. § 1129.

The intricacies of the bankruptcy code functionally require that Metromedia secure the support of the asset sale transaction from the holders of at least two-thirds of the company's preferred stock. Therefore, the company negotiated and entered into a voting lock-up agreement with the holders of roughly 80% of the preferred shares.[13] During the course of negotiations, the preferred stockholders were provided with, subject to confidentiality agreements, a sizable amount of non-public information regarding Metromedia's financial condition in order to value their interests. In those negotiations, they were also able to exert their bargaining power to guarantee a highly favorable treatment for the preferred shares in the transaction.

The company's interaction with the preferred stockholders and the buying group culminated on October 2, 2006 when Metromedia publicly announced its execution of the voting and lock-up agreement with the preferred stockholders and a letter of intent with the buying group. The letter of intent contemplated a gross purchase price of $480 million for Metromedia's equity stake in Magticom. That agreement also provided for a 60–day exclusivity period during which the buying group was to complete its due diligence and finalize a definitive purchase agreement. The company stated its expectation that a definitive agreement would be signed by early December 2006, at which time the board would immediately cause Metromedia to file for bankruptcy protection in Delaware. Also on October 2, Metromedia finally released unaudited financial information relating to Magticom's strong operating performance in 2004 and 2005.

The proposed structure of the transaction results in two glaring inequities. First, the transaction prevents the common stockholders from voting on a sale of Metromedia's assets, a right they have under both 8 *Del. C.* § 271(a) and the company's certificate of incorporation.[14]

---

**12.** Only two directors, Subotnick and Henderson, were aware of any such request. Attorneys for Metromedia's outside counsel, Paul Weiss, ran the idea of an exemption past an SEC staff member during a telephone call. When the attorneys were apparently told such an exemption was "highly unlikely," they took no further action.

**13.** 11 U.S.C. § 1129(a)(7)(A) requires that each class of "impaired" interests under a plan of reorganization "accept" the plan. 11 U.S.C. § 1126(d) provides that a class of interests has "accepted" a plan if the holders of at least two-thirds of the amount of such interests vote in favor of the plan. Thus, the voting agreement ensures that the preferred stockholders would be deemed to have "accepted" the plan of reorganization for purposes of plan confirmation.

**14.** Metromedia apparently takes the position that the common stockholders, as a class, will either not be "impaired" under the plan of reorganization or will "receive or retain under the plan ... property of a value ... that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title...." *See* 11 U.S.C. §§ 1129(a)(8), (a)(7)(A)(ii).

Second, the holders of the preferred stock are given a vote on a transaction that, if consummated outside the bankruptcy context, they would not have under the certificate of designation.[15]

## II.

The plaintiffs filed a motion seeking to preliminarily enjoin Metromedia from executing an agreement with the buying group absent an affirmative vote of the majority of the company's common stockholders pursuant to 8 *Del. C.* § 271(a). Their motion also seeks other relief, including an injunction against the operation of the preferred stock lock-up agreement that is challenged as *ultra vires.* The parties engaged in expedited discovery on the matter and submitted briefs in support of their respective arguments.

At oral argument on November 22, 2006, the defendants backpedaled from their position that the sale of Magticom should be accomplished in bankruptcy court, without a common stockholder vote. Instead, counsel for the defendants proposed that the parties stipulate to, and the court enter, an order addressing several salient concerns for the purpose of requiring the corporation to convene a meeting of stockholders in order to consider the proposed transaction. This suggestion was amenable to the plaintiffs and to the court.

First, the parties agreed that any agreement entered into by the company for the sale of Magticom would be subject to a vote of the common stockholders under 8 *Del. C.* § 271(a). Second, the parties concurred that the directors would make a concerted effort to seek exemptive relief from the SEC to permit the company to solicit proxies and to provide its stockholders with relatively robust financial information concerning Magticom. Third, regardless of the success of its request for exemptive relief, the company would distribute all information required under Delaware law to ensure that the section 271 vote is informed. Fourth, the company would take all necessary steps to encourage the common stockholders to attend the section 271 meeting and cast a vote on the proposed transaction. Finally, the court would reserve jurisdiction over the present dispute and would reserve the right to adjust any terms contained in the order upon application by either party.[16]

---

Thus, a vote of the common stockholders will not be required for the bankruptcy court to approve the plan under 11 U.S.C. § 1129.

**15.** The terms of the preferred stockholders' certificate of designation do not provide them with the right to vote on a merger, combination, sale of all or substantially all assets, or any other corporate transaction that fundamentally changes the nature of the enterprise. In fact, the preferred stock, under the express terms of the certificate, was of a "perpetual" nature. Those stockholders had no right to mandatory redemption. Only an event of "liquidation" would entitle the preferred shares to be paid out under the terms of their contract. Interestingly, a merger or sale of assets would not trigger the preferred shares' liquidation preference under the certificate of designation.

**16.** The order also expressly defers a ruling by this court on the validity of the lock-up and voting agreement entered into by the company with the preferred stockholders. Under the terms of the preferred's certificate of designation, the claims of that stock in an event of liquidation are contractually limited. The preferred stockholders only have a right to their liquidation preference ($50 per share), plus any accrued but unpaid dividends.

Under the lock-up agreement, the preferred stockholders would receive $68 per share from net distributable cash from the sale of Magticom for $420 million or less; 50% of any net distributable cash in excess of $420 million until they have received full payment of all dividends payable on their shares; and 20% of any net distributable cash above that level.

At the presently offered purchase price of $480 million, the preferred stockholders

Accordingly, this opinion discusses the foundations of the order now entered by the court embodying the agreement reached by the parties.

## III.

A. *The Board's Decision To Pursue The Transaction In A Bankruptcy Sale Does Not Trigger "Compelling Justification" Review*

■ The stockholders of Delaware corporations enjoy the fundamental right to vote on certain corporate matters.[17] As such, Delaware courts consistently strike down board actions that inequitably circumvent the proper exercise of the stockholder franchise.[18] The duty of the courts to protect the stockholder vote is at its highest when the board action relates to the election of directors or other instances of directorial control.[19] In other situations where the stockholder vote is implicated, the courts "maintain vigilance to ensure that the voting process ... allows the stockholders a full and fair opportunity to vote."[20]

■ In the context of the election of directors, board action "designed principal-ly to interfere with the effectiveness of a [stockholder] vote," even if taken honestly and in subjective good faith, is not subject to the deferential business judgment rule.[21] Rather, the board of directors "bears the heavy burden of demonstrating a compelling justification for such action."[22] Because of the stringent nature of this standard of review, even a board's honest belief that its incumbency protects and advances the best interests of the stockholders is not a compelling justification.[23] Instead, such action typically amounts to an unintentional violation of the fiduciary duty of loyalty.[24]

■ In contrast, "when the matter to be voted on does not touch on issues of directorial control, courts will apply the exacting *Blasius* standard sparingly, and only in circumstances in which self-interested or faithless fiduciaries act to deprive stockholders of a full and fair opportunity to participate in the matter and *to thwart what appears to be the will of a majority of the stockholders*."[25]

■ For several reasons, the court is convinced that the board's seemingly good

would take a discount on their claims. In fact, they would not recover their full contractual entitlement unless the sale takes place at a price in the $506–$535 million range, depending on the closing date. Thus, if Magticom ultimately sold for such a price, the preferred stockholders, by way of the lock-up agreement, would become entitled to payments in excess of those provided in the certificate of designation. Because it is unnecessary to do so at this point, the court does not determine whether this contract was an *ultra vires* action by the board.

17. *See, e.g., Blasius Indus., Inc. v. Atlas Corp.,* 564 A.2d 651, 669 (Del.Ch.1988); *Hubbard v. Hollywood Park Realty Enters., Inc.,* 1991 WL 3151, at *11, *13 (Del.Ch. Jan. 14, 1991).

18. *See, e.g., Schnell v. Chris–Craft Indus., Inc.,* 285 A.2d 437, 439–40 (1971); *Aprahamian v.*

*HBO & Co.,* 531 A.2d 1204, 1208–09 (Del.Ch. 1987).

19. *See In re The MONY Group Inc. S'holders Litig.,* 853 A.2d 661, 673 (Del.Ch.2004) (citing *MM Cos. v. Liquid Audio, Inc.,* 813 A.2d 1118, 1127 (Del.2003)).

20. *See id.* (citing *Wisconsin Inv. Bd. v. Peerless Sys. Corp.,* 2000 WL 1805376 (Del.Ch. Dec. 4, 2000)).

21. *Blasius,* 564 A.2d at 660.

22. *Id.* at 661.

23. *Id.* at 663.

24. *Id.*

25. *MONY,* 853 A.2d at 675 (emphasis added).

faith decision to structure the Magticom transaction as a bankruptcy sale does not trigger the exacting legal standard set forth in *Blasius*. Most important, the directors' decision to structure the transaction in the manner they did cannot be traced to any entrenchment motivation. Indeed, a result of the proposed transaction is that Metromedia's board will cease to exist following the plan of reorganization.[26] Moreover, the defendants have pledged on numerous occasions that the court-ordered stockholder meeting for the election of directors will occur as planned on December 15. Thus, the common stockholders will have the opportunity to elect new directors if they choose.

Furthermore, the board's action is not directed at thwarting "what appears to be the will of a majority of the stockholders."[27] The evidence in the record is clear on this point. As it now stands, approximately 44% of the company's common stock supports the terms of the asset sale. By contrast, the plaintiffs represent only 8.2% of Metromedia's common equity. Thus, this is not a case where a clear majority of the stockholders have voiced disapproval of a transaction and an undeterred board has taken action to prevent that majority from employing its voting power to accomplish some objective disfavored by the directors.[28] Rather, the decision to structure the transaction as a bankruptcy sale resulted from a conclusion that obtaining a favorable vote of an absolute majority of the outstanding common stock as required by 8 *Del. C.* § 271(a) presented a practical impossibility because of the company's perceived inability to call a meeting or to solicit proxies. In light of these facts, the compelling justification standard of *Blasius* cannot be properly invoked on the grounds that the board's action thwarts the clear will of the majority.

**B.** *The Board's Decision To Structure The Transaction As A Bankruptcy Sale Was An Inequitable One*

■ The protections of the business judgment rule, when coupled with the doctrine of independent legal significance, provide a board with substantial discretion in determining the proper method by which to structure a material corporate transaction. That discretion, however, remains bounded by fundamental principles of equity that "necessarily limit[ ] what a board of directors can do" in its attempt to consummate such a transaction.[29] At the heart of this mandate lies the oft-cited axiom that "inequitable action does not become permissible simply because it is legally possible."[30] The court believes that while the directors' actions here do not fall under the *Blasius* framework, those actions nonetheless offend fundamental notions of equitable conduct.

**1.** *Metromedia's Proposed Use Of The Bankruptcy Process Amounts To Inequitable Conduct*

■ Metromedia's financial circumstances provide strong evidence of the in-

---

**26.** It is also noteworthy that well before this court's order in Esopus's section 211 action, the board was convinced that a bankruptcy sale was necessary in order to sell Magticom. In fact, if Esopus had entered into a confidentiality agreement with Metromedia (as Black Horse did), it would have learned of the structure of the transaction before the section 211 action settled. Thus, there is no suggestion that the decision to resort to bankruptcy court to accomplish the transaction was related to the resolution of the section 211 case.

**27.** *MONY*, 853 A.2d at 674.

**28.** *See, e.g., Blasius*, 564 A.2d at 660.

**29.** *MONY*, 853 A.2d at 676.

**30.** *Schnell*, 285 A.2d at 439.

equity of a bankruptcy sale. Metromedia is, as a function of both its balance sheet and its ability to pay its debts as they mature, clearly solvent. Magticom is forecast to generate a substantial cushion of cash in the coming years. It therefore seems an abuse of the bankruptcy process for a robust and healthy company, encumbered by virtually no debt, to seek out the vast and extraordinary relief a bankruptcy court is capable of providing.

The defendants correctly observe that the bankruptcy code imposes no "insolvency" requirement for a debtor to voluntarily file a petition for relief.[31] However, bankruptcy courts typically dismiss a voluntary petition under 11 U.S.C. § 1112(b) unless that petition was filed in "good faith."[32] While this court does not presume to determine the presence or absence of "good faith" in that context, the inquiries relevant to that "good faith" standard provide ample support for the notion that the board's conduct here inequitably abridged the justified expectations of the common stockholders.

▮ The "good faith" requirement is equitable in nature, and is premised on the policy that the bankruptcy code should not encourage the "filing of a bankruptcy petition that lacks a valid reorganizational purpose."[33] Truly, "[c]hapter 11 was designed to give those teetering on the verge of a fatal financial plummet an opportunity to reorganize on solid ground and try again, not to give profitable enterprises an opportunity to evade" other contractual and state law obligations.[34] In addition to the general "good faith" requirement imposed by 11 U.S.C. § 1112(b), a bankruptcy court must determine whether a "good business reason" exists for a sale of assets pursuant to 11 U.S.C. § 363.[35] In making that determination, the "most important[ ] [inquiry by the court] perhaps [is] whether the asset [to be sold] is increasing or decreasing in value."[36]

Metromedia, judging from all the evidence in the record, is a financially healthy company that is simply delinquent in its SEC filing obligations. Its single self-admitted purpose for its plan to filing bankruptcy is to sell its interest in Magticom without complying with section 271's vote requirement, distribute the sale proceeds to its stockholders, and cease business operations. Additionally, the Magticom asset is clearly not decreasing in value. On the contrary, its value appears to have substantially increased in recent months and years. These facts, when viewed in light of the underlying rehabilitative purposes of the bankruptcy code, persuade the court that Metromedia's proposed transactional scheme, though technically within the letter of the law, works a profound inequity upon the company's common stockholders and is thus prohibited by the teachings of *Schnell v. Chris–Craft Industries, Inc.*[37] And while the defendants are correct that the Supremacy Clause of the United States Constitution and federal preemption jurisprudence prevent this court from issuing an order enjoining them from filing a bankruptcy peti-

**31.** *See* 11 U.S.C. § 301; *In re Donaldson Ford, Inc.*, 19 B.R. 425, 431 (Bankr.N.D.Ohio 1982).

**32.** *In re SGL Carbon Corp.*, 200 F.3d 154, 160 (3d Cir.1999).

**33.** *Id.* at 156.

**34.** *Id.* at 166 (citing *Furness v. Lilienfield*, 35 B.R. 1006, 1009 (D.Md.1983)).

**35.** *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir.1983).

**36.** *Id.*

**37.** 285 A.2d 437.

tion,[38] this court unquestionably has the power to prevent the board of directors from binding the company to a transaction to sell Magticom before first complying with the mandates of 8 *Del. C.* § 271.

### 2. *The Enfranchisement Of The Preferred Stockholders Also Suggests That The Board Acted Inequitably*

■ According to Metromedia's basic organizational documents, the only stockholder constituency entitled to vote on a fundamental change of the company's form, such as a sale of substantially all assets, is the common stockholders. By the terms of their certificate of designation, the preferred stockholders' rights are protected from encroachment by two basic contractual provisions. First, the preferred stockholders may appoint two representatives to the board of directors upon the company's failure to pay dividends for six consecutive quarters. Second, the preferred stockholders are entitled to a liquidation preference upon the winding-up of the company's business.

But, in structuring the proposed transaction as it has, the board expanded the rights of the preferred stockholders beyond their contractual or statutory entitlements. By entering into the lock-up agreement, the substance of which contemplates a court-supervised sale of Magticom in bankruptcy, the directors effectively granted the preferred stockholders substantial additional bargaining power to influence the company's disposition of its remaining assets.

In lieu of holding a statutory right as residual owners to approve the proposed Magticom sale, the common stockholders find themselves relegated to the status of sideline objectors in bankruptcy court.

The defendants claim that the expedited process of a bankruptcy auction, when coupled with the common stockholders' right under the bankruptcy code to object and be heard by the bankruptcy court, acts as an effective substitute for a statutorily imposed vote. The defendants emphasize the fact that "the plaintiffs have failed to cite a single case in which the court held that a stockholder vote was required in connection with the sale of all or substantially all of a company's assets in a bankruptcy case. No such requirement exists." [39]

That is precisely the point. The primary interests protected by the bankruptcy process are those of creditors. Because of this simple fact, the bankruptcy code does not contemplate a freestanding right to vote by the holders of common equity. Were such a vote available, the legal rights of the creditors to the remaining assets of the entity would take a subsidiary position to the interests of the residual owners who, at least where a company is insolvent, no longer have any cognizable financial interest to protect.

In sum, the actions of Metromedia's directors in structuring the proposed transaction as they did resulted in a theoretically legal, yet undeniably inequitable, reallocation of control over the corporate enterprise. That reallocation does not withstand close judicial scrutiny.

### 3. *The Board Failed To Explore SEC Exemptive Relief*

Metromedia's delinquency in its periodic reporting does raise at least two issues under the federal securities laws: first, its inability to furnish a proxy statement or to solicit proxies; and second, its inability to furnish an information statement in lieu of

---

**38.** *See, e.g., In re Kreisers, Inc.,* 112 B.R. 996, 998–1000 (Bankr.D.S.D.1990).

**39.** Defs.' Answering Br. 29.

soliciting proxies. These strictures are found in sections 14(a) and 14(c) of the 1934 Act,[40] and the rules and regulations promulgated thereunder.

As discussed in *Newcastle Partners*, the overriding purpose of federal regulation of the corporate proxy solicitation process is to protect shareholder voting rights.[41] As observed in that case, referring to section 14(c), "[n]othing in ... that statute ... suggests any purpose to interfere with the power of state courts to require that stockholder meetings be held in accordance with the requirements of state corporation law in situations where the registrant corporation is delinquent in its SEC filings obligations." The same can as easily be said of section 14(a).

The SEC has broad authority to issue *ad hoc* exemptions from the requirements of the federal securities laws. Section 36(a) of the 1934 Act provides that the SEC may "by rule, regulation, or order ... conditionally or unconditionally, exempt any person, security, or transaction ... from any provision or provisions of this title or of any rule or regulation thereunder, to the extent that such exemption is necessary or appropriate in the public interest, and is consistent with the protection of investors."[42] As this court recognized in *Newcastle Partners*, the SEC often uses it exemptive authority in a manner that supports important state law standards of corporate governance.[43] The stockholder voting requirement of 8 *Del. C.* § 271(a) is just such an important corporate governance standard and is fully deserving of protection under the federal securities laws.

Given the mutually reinforcing purposes of these state and federal laws, there is reason to suppose that the SEC will duly consider a request for exemptive relief by Metromedia for the purpose of allowing it to convene a meeting of stockholders in accordance with this court's order. The defendants maintain that the only reason Metromedia is not current in its securities filings is because of KPMG's mismanagement and continued obstinancy pertaining to small disagreements with the company's financial statements that do not greatly affect the overall value of a stockholder's stake in the company. If this is truly the case, then the company's sale of Magticom would seem to be a prime candidate for the SEC's discretionary use of its exemptive power to allow the stockholders an informed opportunity to vote on a potentially beneficial transaction that would result in the dissolution of the corporation and the deregistration of its securities. In this light, this court's order expressly contemplates that Metromedia will promptly seek exemptive relief broad enough to permit it to comply with the order's requirement of a stockholder vote.

## C. The Court's Future Powers With Regard To This Matter

It is appropriate now to mention one final relevant point. Pursuant to 8 *Del. C.* § 322, the Court of Chancery enjoys the ability to appoint a receiver when and if a corporation "refuse[s], fail[s], or neglect[s] to obey any order or decree of any [Delaware court]...." Though 8 *Del. C.* § 322 does not expound upon the powers and duties of a receiver so appointed, 8 *Del. C.* § 291 does discuss those powers and duties, albeit in the context of an insolvent

---

**40.** 15 U.S.C.A. §§ 78n(a) and (c).

**41.** 887 A.2d at 980–81.

**42.** 15 U.S.C.A. § 78mm(a).

**43.** 887 A.2d at 980–81, 981 n. 14 (citing Louis Loss & Joel Seligman, Securities Regulations § 6–C–7 (1989)).

company. That statute provides that a receiver may "take charge of [the corporation's] assets, estate, effects, business and affairs ... and do all other acts which might be done by the corporation and which may be necessary and proper." Pursuant to the doctrine of *in pari materia,* the court observes that, if one became necessary to effectuate the terms of the order, a duly appointed receiver would accede to similar powers and duties.[44]

■ The case law concerning the appointment of a receiver for a solvent corporation outside the context of section 322 is understandably sparse. However, an articulated standard does exist. While "[m]ere dissensions among corporate stockholders, whether over internal matters or otherwise, will seldom justify the appointment of a receiver," this drastic prophylaxis may be appropriate for the protection of stockholders when "fraud, gross mismanagement or extreme circumstances causing imminent danger of great loss which cannot otherwise be prevented" are clearly shown.[45]

The court now has no occasion to consider whether or not circumstances justifying the appointment of a receiver could arise in this case, either under section 322 or more general principles of equity. Indeed, the fact that 44% of the common stockholders have indicated support for the proposed transaction makes it unlikely that the meeting of stockholders required under the terms of the order will fail to produce a decisive outcome. Nevertheless, it is important to note that a state law process is available to deal with management's inability to properly fulfill its duty to hold an election—a process well capable of protecting the interests of all constituent groups.

**IV.**

For the foregoing reasons, the agreed upon form of order is entered simultaneously herewith.

---

**44.** *See, e.g., Grimes v. Alteon, Inc.,* 804 A.2d 256, 260, 264 n. 35 (Del.2002) (noting that each section of the Delaware General Corporation Law should be read together in order to produce a harmonious whole).

**45.** *Drob v. Nat'l Mem. Park, Inc.,* 41 A.2d 589, 597 (Del.Ch.1945).